**LIBERTY HILLS DEVELOPMENT,
INC., Appellant,**

v.

**Ruth STOCKSDALE and Commercial
Bank of Liberty, N.A., Respondents.**

No. WD 38994.

Missouri Court of Appeals,
Western District.

Nov. 3, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 29, 1987.

Michael A. Childs, Kansas City, for appellant.

William D. Adkins, Steven L. Hobson, Liberty, for respondents.

Before GAITAN, P.J., CLARK, J., and KENNEDY, C.J.

GAITAN, Judge.

This suit involves plaintiff-appellant, Liberty Hills Development, Inc. and defendant-respondent, Ruth Stocksdale. It was originally filed in three counts. Count I, against Ruth Stocksdale and the Commercial Bank of Liberty, N.A., (hereinafter referred to as "the bank") for breach of an alleged oral contract guaranteeing payment of a third party's promissory note for $19,500. Count II, against both defendants, sought actual and punitive damages for fraudulent misrepresentation in connection with the alleged oral guaranty contract. Count III was against Ruth Stocksdale only, seeking actual damages for breach of a fiduciary duty she owed to plaintiff as a member of its board of directors.

As a consequence of defendants' motion for summary judgment, Count II was dismissed by the court, and plaintiff dismissed Count III prior to the commencement of trial. At the close of plaintiff's evidence the defendants jointly moved for a directed verdict as to Count I. That motion was sustained as to defendant Commercial Bank only. This jury found in favor of defendant, Ruth Stocksdale. This appeal was solely directed to Count I and defendant Ruth Stocksdale. The judgment is reversed and remanded.

The evidence presented in this case may be summarized as follows. Plaintiff corporation was formed to establish a country club in the area of Liberty, Missouri. Plaintiff purchased approximately 600 acres of developed real estate in that area for that purpose. Of the 600 acres purchased, 300 acres was used to develop a golf course and a remaining 300 acres was to be used for residential development. The real estate development was financed by Commercial Bank of Liberty. Defendant Ruth Stocksdale owned 90% control of the voting rights in Commercial Bank of Liberty. She was also vice-president of the plaintiff corporation.

In an effort to develop the real estate it owned, plaintiff sold a lot to a developer named Miller in 1980. The lot Miller purchased will be referred to as lot 26. Miller purchased the lot to build a home for sale in the $150,000.00 price bracket. In payment for that lot, plaintiff took Miller's second mortgage on the property in the amount of $17,500.00. His first mortgage on that property was a construction loan held by Commercial Bank of Liberty in the amount of $95,000.00. Miller eventually sold the house on that lot to Mr. & Mrs. Emrich. The Emrichs arranged to finance this purchase with a first mortgage from Commercial Bank of Liberty in the amount of $122,900.00. However, Miller did not receive cash for the sale, taking an older home on trade instead.

Plaintiff, through its president Jewett Fulkerson, testified that in order to insure the sale of this property, he was asked by the defendant to release the Miller's second mortgage and take instead a mortgage executed by the Emrichs which would be second to the bank's first mortgage in the amount of $122,900.00. Mr. Fulkerson testified that he was concerned about making such a release without some assurances of payment. He testified that he communicated this to the defendant who in turn told him "she would take care of it". He interpreted this as a guaranty by the defendant of the Emrichs' second mortgage.

The defendant testified that she did not have such a conversation with Mr. Fulkerson and denies that she would ever consider guaranteeing a second mortgage in the manner that he has testified to. Mr. Fulkerson testified that in exchange for the commitment by the defendant, he executed a release of the Miller's second mortgage. The Emrichs eventually defaulted on their payment for the home and the bank foreclosed on the property leaving no money to cover the second mortgage held by the plaintiff. As a consequence, the plaintiff filed its lawsuit which was ultimately sub-

mitted to the jury on Count I relative to Ruth Stocksdale only. The jury returned a verdict in favor of the defendant.

The plaintiff appeals, contending the trial court erred in the following respects. First, by permitting the defendant's converse instruction which failed to track the plaintiff's verdict directing instruction. Second, that said converse instruction failed to define technical legal terms used therein. Third, by allowing defense counsel to comment on claims in plaintiff's petition that had been dismissed prior to trial. Fourth, by permitting defense counsel to inject into the case evidence which was not relevant or material to any issue in the case. Defendant has asserted that there was insufficient evidence of a contract to submit the issue to the jury.

## I.

The first point to consider is whether or not the alleged discussions between plaintiff's president, Jewett Fulkerson, and defendant created an oral contract binding on all parties. We must review the testimony of Mr. Fulkerson which is stated as follows:

Q. All right. And did you get involved in any respect with that transaction between Miller and Emrich?

A. Oh, yes, we got involved. I got a call from Mrs. Stocksdale.

Q. All right.

A. And she said to me, "Would you mind going down—" She said, "The house has been sold. Mr. Miller has sold the house. And would you mind going down to the title company and signing a release on that lot?" And I said to her, "Why, if they've sold it, we're entitled to be paid for the lot." And she indicated to me that Mr. Miller didn't take in too much cash and took an older house in on it. And I said, "I'd like to come down and see you before I go sign any release." So I went down to Mrs. Stocksdale's office.

Q. There at the Commercial Bank?

A. At the Commercial Bank. I've banked there for over 40 years. That's why I went in to see her.

Q. When you went in to see her, tell us what conversation transpired.

A. Well, I said, "Ruth, we're now behind a $95,000 first mortgage and you're asking us to go behind a $122,900 first mortgage for a Mr. Emrich, who—" I know, I'd never heard of the man. And I checked with our board, and no one on our board had ever heard of the man. And I said, "We have no idea who we're dealing with; and you're asking us to increase our obligation to the place where we'll now be behind a $122,900 loan instead of a $95,000 loan."

And she said, "Well, now, Jewett, we didn't take in very much, as I told you— or, Miller didn't. He got an older house in on it." And she didn't give me any amounts of money besides that, but mentioned an older house. And she said, "I wish you'd go down and sign that release." And I said, "Well, if you think it's all right, why, that's fine." And she said, *"You know me, and you know we'll make it."*

[Emphasis added.]

Q. Did you ever ask her for any assurance that you'd get paid for the lot?

A. Well, certainly I asked her. I didn't want an increase of that much without some assurance. And she said she—

Q. Tell me what she said, and what you responded.

A. I said, "Ruth, we would need some assurance, since we're increasing it. I would want some assurance of some kind." And she said, *"Jewitt [sic], you know we'll take care of it when we settle with Mr. Emrich."*

[Emphasis added.]

Q. All right. And what did you take that to mean?

A. I took it to mean that when they settled with Mr. Emrich we would receive—he was a total stranger to all of us—that we would get a settlement.

Q. All right.

A. Of seventeen-five.

Q. Okay. Up to that point in time how long had you known Ruth Stocksdale?

A. Ever since they came to Liberty, I would say. I don't recall when the Stocksdales—when Mr. Stocksdale bought the bank. I can't give you the year. But I was banking there before they ever came.

Q. All right. Had Ruth Stocksdale been associated with the Liberty Hills Development Company as long as you?

A. No. Her husband was; and then after he passed away she went on the board. She went on the board at—and was on the board until this time. She was vice-president of the—of the Development Company. I was president and she was vice-president of the Development Company.

Q. So at the time she asked you to release this on behalf of Liberty Hills Development Company she was a vice-president of Liberty Hills Development Company?

A. That's correct.

Q. And you, of course, were president at that time?

A. That's correct.

Q. What, if you know, was Ruth Stocksdale's position with the bank when she asked for this?

A. Her position with the bank?

Q. Yes.

A. Well, she owns most of the bank—at least I've always understood she owns —she owns most of the bank.

Q. Did you consider putting down in writing and having Ruth Stocksdale sign this written document setting out this agreement? Did you ask your long-time business associate and friend to do that?

A. I did not.

Q. Why?

A. We—and I checked with Mr. Fischer and the other members of the board— we had the utmost confidence in Mrs. Stocksdale; and when she said, "Well, you know, Jewett, we'll take care of it," I thought that was enough. It never occurred to me to say, "Well, now, put it in writing." We just took

it for granted. She's a member of our board, as well as the rest of us; and she was we thought, just as interested in the—in the Liberty Hills Development Company as we were.

Q. Before you went down and signed that deed of release, did you contact other board members to see if they approved?

A. Oh, yes.

Q. Who did you contact?

A. Well, I contacted Mr. Fischer. I contacted Mr. Parrish. I tried to contact Mr. Tyson and I couldn't locate him. And I contacted Hazel Lee Morgan— Mrs. Morgan. And I contacted Mr. Lewis Tapp, a member of our board. And I said they want to increase this, Ruth says it's fine, and—to go ahead. And we went ahead and did it. And they all said well, if she feels that way, why, I'm sure it's all right.

Q. And when you spoke to Don Fischer and Claud Parrish did you tell them the conversation that you had with Ruth?

A. Oh, yes.

Q. Did you tell them that the board would need some assurance of payment, and that she said "Don't worry, we'll take care of it"?

A. That's right.

Q. You told them that?

A. I told them that.

■ The basic elements of a contract are (1) parties are competent to contract; (2) a proper subject matter; (3) a legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. 17 C.J.S. *Contracts* § 1(2) (1963). When we examine the context of the testimony in a light most favorable to the plaintiffs, it is clear that these elements are present. Fulkerson believed that in exchange for releasing his second mortgage that either the bank or its chairman, Ruth Stocksdale, would make sure that this second mortgage was paid. This would take place after the bank settled with the Emrichs. This we believe provides sufficient evidence to submit the issue to the jury for consideration.

While the alleged conversation between Ruth Stocksdale and Jewett Fulkerson could have been more specific, there appears to be sufficient indications that the parties had an agreement and that there was a mutual understanding of facts. *Sharpton v. Lofton*, 721 S.W.2d 770, 776 (Mo.App.1986).

Therefore defendant's assertion that there was insufficient evidence to make a submissible case is without merit.

## II.

The next question presented is whether the jury was given the proper instructions relative to the issue of a bilateral contract to the jury. The appropriate jury instruction for a breach of a bilateral contract where the terms of the agreement and whether the agreement was breached are at issue is MAI 26.06. *Boswell v. Steel Haulers Inc.*, 670 S.W.2d 906, 912 (Mo.App. 1984). The record reveals that the plaintiff attempted to fashion its verdict directing instruction (# 6) in accordance with MAI 26.06 and it was submitted to the jury as follows:

## INSTRUCTION NO. 6

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendant Ruth Stocksdale entered in to an agreement whereby plaintiff agreed to release its Second Deed of Trust on lot 26 for $17,-500.00 which was second to the Commercial Bank of Liberty's First Deed of Trust for $95,000.00 and take a Second Deed of Trust on Lot 26 for $19,500.00, second to the Commercial Bank of Liberty's First Deed of Trust for $122,900.00, and defendant Ruth Stocksdale assure payment of the lot if plaintiff did as agreed, and

Second, plaintiff performed its agreement, and

Third, defendant failed to perform her agreement,
and

Fourth, plaintiff was thereby damaged.

However, it appears that the defendant submitted a true converse instruction which failed to converse any element of the plaintiff's verdict director. As such, it was improper. Instead its verdict director attempts to set forth or emphasize defendant's version of the facts, and was submitted as follows:

## INSTRUCTION NO. 8

Your verdict must be for defendant, Ruth Stocksdale, unless you believe:

First, that Ruth Stocksdale actually made the statement to plaintiff that "We will take care of it"; or

Second, that, if such statement were made, Ruth Stocksdale thereby intended to bind herself as an individual person to an understandable contract with plaintiff company susceptible of mutual assent and understanding, as to all of its terms; or

Third, that by such contract, if any, Ruth Stocksdale intended to personally pay the value of lot 26 mentioned in the evidence if the Emrichs did not pay for it; or

Fourth, that Ruth Stocksdale personally received some reasonable consideration or value from the plaintiff in exchange for her promise if any; or

Fifth, that the Emrichs' note is not going to be paid by Emrichs.

Presumably defendant was attempting to submit an affirmative converse. However, it too was in improper form as well as failing to contain an hypothesized ultimate issue as required by *Tierney v. Berg*, 679 S.W.2d 919 (Mo.App.1984). We believe the converse instruction misdirected and confused the jury. *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682 (Mo. banc 1986). We believe the error to be prejudicial and reverse the judgment and remand the case for retrial.

## III.

There are two additional points raised on appeal by plaintiff which we shall address since they may occur on retrial. First is defendant's reference to claims in plaintiff's petition which had been either

dismissed by the court or abandoned by plaintiff. The defendant's reference to these pleadings was improper because they were irrelevant and used for the purpose of the prejudicing the jury. *Macheca v. Fowler*, 412 S.W.2d 462, 467 (Mo.1967). Examples of his use are as follows:

> ... And by the time we get to you here today, out of three counts in this petition, and out of all these claims of maliciousness and all of that, nothing is left but five words that they say were spoken in 1981, and she says weren't: "It will be taken care of.... (used in opening statement)

and

> This case started out with three counts against Ruth Stocksdale. She was sued for half a million dollars for punitive damages for breach of—

MR. CHILDS: Objection, Your Honor. It's improper argument, and irrelevant.

THE COURT: Overruled.

> MR. VON ERDMANNSDORFF: —and it kind of melted down from that. They just kept backing off from that, until now we're down to one lady—not the bank, the Commercial Bank of Liberty: we're down to Ruth Stocksdale, the individual...."

(used in closing argument)

■ Second, the representation of evidence concerning whether the bank had lost money on the transaction was irrelevant and immaterial. The sole parties to this action were plaintiff and Ruth Stocksdale. The financial success or failure of the bank is not at issue here. *Taylor v. Schneider*, 370 S.W.2d 725, 727 (Mo.App. 1963).

The judgment of the trial court is reversed. The case is remanded for retrial as to Count I and defendant, Stocksdale, only, in accordance with the directions stated herein.

All concur.