**NOONEY KROMBACH COMPANY, Plaintiff/Appellant/Cross–Respondent,**

v.

**BLUE CROSS AND BLUE SHIELD OF MISSOURI, Defendant/Respondent/Cross–Appellant.**

No. 68390.

Missouri Court of Appeals, Eastern District, Division Five.

Aug. 6, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 9, 1996.

Application to Transfer Denied Oct. 22, 1996.

David Wells, Michael J. Morris, Tracy J. Cowan, Thompson Coburn, St. Louis, for plaintiff/appellant/cross–respondent.

Martin J. Toft, II, Mark A. Kinzie, Stinson, Mag & Fizzell, P.C., St. Louis, for defendant/respondent/cross–appellant.

CHARLES B. BLACKMAR, Senior Judge.

The plaintiff is a licensed real estate broker specializing in business property. The defendant is a major provider of health care services. The plaintiff filed suit, seeking in Count I a commission on the sale by the defendant of its headquarters building in St. Louis and in Count II a commission on the purchase by the defendant of a new headquarters facility.[1] The jury returned a verdict for the plaintiff on both counts for the total amount sought. The trial judge entered final judgment for the plaintiff on Count I but entered judgment for the defendant notwithstanding the verdict on Count II. Both parties appeal. We conclude that the plaintiff made a submissible case on both counts and that there is no demonstration of trial error such as to require reversal. We therefore affirm in part, reverse in part, and remand for entry of judgment on the original verdict. We state the facts the jury could have found in support of its verdict and explicate the inferences it might have drawn from those facts, without discussion of contrary evidence and other possible inferences. To the extent that there are disputed factual issues, the jury has already resolved them. Factual issues not submitted to the jury through instructions are taken to have been found in a manner consistent with the verdict.

In the fall of 1990 the defendant received an inquiry from Washington University about whether the defendant's headquarters building at 4444 Forest Park Boulevard in the City of St. Louis, which adjoins the vast Washington University medical complex, might be for sale. The plaintiff had nothing to do with this approach. The university was advised that the defendant was not sure that it wanted to relocate.

In December of 1990 an organization known as Forsythe Group suggested that it owned a building across from Union Station Plaza in St. Louis which might fulfill the defendant's needs for the foreseeable future. The plaintiff likewise had nothing to do with this proposal and, so far as the record shows, knew nothing about it until several meetings between representatives of the defendant and of Forsythe had been held.

In late December of 1990 or early January of 1991 Gail Sphar, the defendant's Senior Vice President of Administration and Corporate Affairs, sought the advice of the plaintiff about the possible relocation of its headquarters, which would also involve selling the Forest Park building. The plaintiff was primarily represented by Glenn B. Guenther, who had worked with Sphar on a previous transaction in which the defendant rented downtown office space. The defendant did not at this time suggest that the plaintiff

---

1. Counts III and IV brought claims for quantum meruit on both the sale and purchase transactions. The trial court entered directed verdicts on Counts III and IV prior to submitting Counts I and II to the jury.

perform the normal function of a broker in seeking offers for the purchase of its building, because it was not sure that it wanted to sell the building and relocate. It rather sought advice on possible facilities that might be available for relocation and the terms on which they might be acquired. Unless it could find a new location it would not be in a position to sell the Forest Park Property. Guenther showed great interest in possible commissions on consummation of the transactions. In late January and early February of 1991 he proposed three separate, but necessarily related, contracts.

He proposed, initially, that defendant pay plaintiff $90,000.00 in six installments of $15,-000.00 each, unconditionally. If there were no sale and purchase, the plaintiff would receive only this amount for its services. All sums so paid would be credited on any commission received by the plaintiff on account of the defendant's purchase of a building. This proposal was made in a series of letters but apparently was not formalized in a document signed by both parties. The installments, however, were paid each month between February and August of 1991, and this agreement is not drawn into the present litigation.

The second agreement had to do with the sale of the Forest Park property. It was initially set out in a letter from plaintiff to defendant dated January 31, 1991, in which it was proposed that

> In consideration for our role as Blue Cross and Blue Shield of Missouri's representative in the sale or lease of its headquarters facility located at 4444 Forest Park Boulevard, we are accepting of a fee equating to two percent of the total sale price in the event of a sale.... Additionally, we would expect to split these fees 50%/50%, should there be a procuring broker involved who produces a ready, willing, and able purchaser or tenant for the building.

The third proposal was for an "Exclusive Representation Agreement" for an initial duration of six months. Significant terms of the proposed agreement read as follows:

> Principal [the defendant] hereby appoints Nooney Krombach Company as Exclusive Agents to locate the described real estate and to aid Principal in negotiating terms and conditions of the transaction.

> Nooney Krombach Company agrees to use its full market resources to locate a property acceptable to Principal, and to further represent the best interest of Principal in negotiating terms and conditions of the transaction.

> During the term of this Agreement, Principal agrees to fulfill the requirements described below solely through Nooney Krombach Company, and to inform all other brokers, salesmen, or owners who contact the Principal of this appointment, and to refer them to Nooney Krombach Company.

> Principal and Nooney Krombach Company agree that Nooney Krombach's compensation for this exclusive representation will be paid to Nooney Krombach Company by the Seller if the transaction is a sale, or by the Lessor if the transaction is a lease *except as otherwise agreed by the parties.* (Emphasis supplied).

> The exclusive right to represent Principal shall commence on this date and continue for a period of six (6) months; however, Principal shall have the right upon thirty (30) days notice to agent, by certified mail, to terminate this agreement with no obligation to compensate Nooney Krombach Company in any manner,

The two written proposals were included with a letter of transmittal dated February 1, 1991. They were not acted upon immediately by Sphar and on February 15, 1991 Guenther wrote a letter in which he inquired about the delay and expounded further thoughts about his proposals, making it clear that the plaintiff proposed to credit all payments on the $90,000.00 fee on any commission subsequently received under the exclusive representation agreement. The proposals were then reviewed by the defendant's in-house real estate attorney. He suggested an addendum to the exclusive representation agreement to make it clear that payments on the $90,000.00 fee were to be deducted from any amount otherwise due under that agreement, as plaintiff had previously proposed. Following this review

Sphar signed the two agreements as tendered, along with the addendum to the Exclusive Representation Agreement, dating the latter February 21, 1991.

■ The defendant argues that, inasmuch as the plaintiff drafted the two agreements, they should be construed strongly against it. This proposition, often applied in insurance contracts, has little application to the present case. The parties were both substantial organizations. The plaintiff's proposals were reviewed by the defendant's real estate counsel, who recommended an addition to one of the contracts. The contracts, then, are to be construed in accordance with the language used. Extrinsic evidence of prior or contemporaneous understandings is not admissible to alter the terms of the signed agreements, but explanatory evidence not inconsistent with their terms is not precluded as an aid to interpretation. See *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330 (Mo. banc 1996) (Robertson, J., dissenting); *J.S. DeWeese Co. v. Hughes–Treitler Mfg. Corp.*, 881 S.W.2d 638, 644 (Mo. App.1994).

In the meantime, on February 13, 1991, before the contracts were signed, David Wilhelm of Forsythe Group made a presentation to the defendant's principal executives regarding the Forsythe Plaza property. Guenther attended this meeting at the request of the defendant. Heimburger, CEO of the defendant, said at the meeting that if Forsythe could deliver on its promises then defendant and Forsythe "would have a deal." Other representatives of defendant were more cautious and spoke of the need for thorough evaluation. Sphar told the plaintiff to analyze the Forsythe proposal carefully and to look for alternative sites which might meet the defendant's needs.

The plaintiff then undertook a search for other available properties. Guenther contacted three other developers who submitted proposals and obtained from each an agreement to pay the plaintiff a commission at the rate of 3% if a successful sale were negotiated. These solicitations were with the defendant's entire knowledge and consent. The rate of 3% in event of a sale (or 2% in event

of a lease) had been mentioned in the prior correspondence between the parties.

Guenther also sought an undertaking from Forsythe similar to those to which the other developers had agreed. When Forsythe did not respond he sought and obtained Sphar's assistance in persuading Forsythe to deal with the plaintiff as defendant's representative and to agree to pay the plaintiff a commission if the transaction were consummated in accordance with the terms of the exclusive representation agreement. Wilhelm of Forsythe, in a letter of March 28, 1991, rejected these overtures and advised defendant that he was unwilling to deal through the plaintiff or to agree to pay the plaintiff a commission. He viewed the plaintiff's efforts as an impediment to the transaction he sought to market. Yet the defendant, at the time, wanted to consider competing offers and wanted the plaintiff's assistance in doing so.

Guenther continued to work on the defendant's needs but was anxious about his firm's commission, should the transaction with Forsythe be the one the defendant selected. He shared his concern with Sphar, who spoke to Heimburger. Heimburger authorized Sphar to tell the plaintiff that it "will be taken care of" if defendant should reach agreement with Forsythe. The jury could have found that he was referring to plaintiff's commission. Guenther did not speak with Heimburger personally. Sphar reported Heimburger's message to Guenther in May of 1991. The plaintiff continued with its examination of the several proposals and studied appraisals of the Forsythe property after receiving Heimburger's assurance as transmitted through Sphar. In the summer of 1991 it prepared a detailed comparative analysis of the several opportunities. All four proposals from the developers were still being actively considered as late as August of 1991. The plaintiff expressed to the defendant the opinion, based on the appraisals, that the asking price of the Forsythe property was too high.

Heimburger himself was active in the discussions with Washington University, but was in consultation with the plaintiff. In mid-summer of 1991 he advised the plaintiff in writing that he wanted it to play a more active role in these discussions. There is no

evidence that the plaintiff failed to do anything it was asked to do as the defendant's exclusive representative in the possible sale of the Forest Park building.

In August of 1991 Sphar executed on behalf of the defendant a six-month extension of the Exclusive Representation Agreement. At about the same time the plaintiff, without being requested to do so, undertook to limit its potential commission under the exclusive representation agreement to $800,000.00, whatever the source. Its proffered explanation was that it wanted to place all proposals on the same footing so that there would be no economic advantage to it in recommending one proposal over another. Sphar was agreeable to the reduction.

In late August of 1991 Heimburger, without notifying his subordinates or the plaintiff, undertook direct negotiations both with Forsythe and with Washington University. These resulted in agreements in principle in early September of 1991 and, following approval by the Board of Directors, a closing of both the purchase and the sale transactions in February of 1992. The sale price for the Forest Park property was $25,000,000.00 and the purchase price of the Forsythe Plaza building $31,000,000.00. This latter price was substantially less than Forsythe's initial asking price. The plaintiff tendered its services on learning of the incipient agreement, but these were not accepted. Heimburger took the position that no payments were due to the plaintiff on account of either the purchase or the sale, asserting that it had received all the compensation due it by reason of the payment of $90,000.00. Sphar, with whom the plaintiff had regular dealings regarding the possible sale and purchase, expressed the opinion that the plaintiff was entitled to some commission. When its claims were rejected the plaintiff sued.

The petition contained four counts. The trial judge submitted only Count I, regarding the Washington University transaction, and Count II, on the Forsythe purchase, to the jury, which returned a verdict for the plaintiff of $500,000.00 on Count I and $710,000.00 ($800,000.00 minus the $90,000.00 previously paid) on Count II. The court entered judgment on the verdict on Count I but set aside the judgment on Count II and entered judgment for the defendant on that count. The plaintiff appeals the setting aside of its verdict and the defendant appeals the judgment entered against it.

The evidence, then, shows that the parties entered into a very unusual series of contracts. The contract regarding the Forest Park property provided for a commission "in consideration of our role as Blue Cross and Blue Shield's representative in the sale or lease of its headquarters facility...." There was no requirement that the plaintiff be the procuring cause of the sale, and the most likely purchaser had already made itself known to the defendant. The "exclusive representation agreement" called for the plaintiff to "locate" real estate and to aid [the defendant] in negotiating terms and conditions ... in return for a commission to be paid by the seller or lessor, "except as otherwise agreed by the parties." Here too a prospective seller or lessor had already approached the defendant, and the plaintiff was asked to study that proposal while soliciting others. If there was no purchase, there would be no sale. The plaintiff would receive commissions of substantial size only if both transactions were consummated, but was to retain the $90,000.00 payment whether or not the defendant decided to relocate. It is manifest that the defendant's representatives expected that commissions would be paid to the plaintiff. The parties were dealing at arm's length. We must decide whether the plaintiff has made a case for either or both commissions. If the parties have agreed on contract terms it is not for us to say whether the terms were reasonable, whether the services rendered were worth the price, or whether the defendant could have achieved its purposes without the plaintiff's assistance.

### Defendant's Appeal—Count I

■ The defendant in its first point as cross-appellant argues that the plaintiff, in order to make a submissible case in its claim for a commission on the sale of the Forest Park property, must show either that it was the procuring cause of the sale or that its contract gave it an "exclusive right to sell," as distinguished from an "exclusive agency"

in which the owner reserved the right to make a sale itself without the assistance of any broker. It cites standard treatises and cases expounding the common law of real estate brokerage. The plaintiff declares, however, not on a conventional brokerage contract, express or implied, but on a written agreement in which it was promised a commission "in consideration for our role as [defendant's] representative in the sale or lease of its headquarters facility. . . ." The plaintiff was not retained to seek out purchasers. The most likely purchaser, by contrast, had already made itself known. There are indications that a later search for purchasers might be indicated to provide a degree of competition if the university made too modest an offer, but the contract did not require the plaintiff to show that it was the procuring cause of any sale, and the contract would have no meaning if the defendant could freely sell to the only prospective purchaser who was then known without compensating the plaintiff. The defendant apparently thought that the plaintiff's services would be valuable and agreed to pay a commission if the property were sold. The plaintiff did what was asked of it.

■■ In its second point the defendant argues that the contract regarding the Forest Park property is invalid under 4 CSR 250–8.090, because it fails to list the price, a definite beginning date, an expiration date, and "the type of listing, that is, exclusive agency, exclusive right to sell, or open." We are inclined to agree with the trial court that the contract was not a "listing agreement," because it was not the ordinary contract in which a broker undertakes to seek out prospective purchasers, but rather purported to compensate the plaintiff for acting as its representative. We also question the authority of the Real Estate Commission to adopt a regulation which would invalidate contracts which are not conventional listing agreements and which are not otherwise invalid. The powers of administrative agencies are confined to those expressly conferred by statute. *Metro Auto Auction v. Director of Revenue,* 707 S.W.2d 397 (Mo. banc 1986).

The conclusive answer to the defendant's argument, however, is that the regulation relied on does not purport to invalidate the contract. It simply provides, as to commercial property, that a licensee shall not "advertise or place a sign on any property offering it for sale or lease to prospective customers unless a broker holds a currently effective listing agreement or other written authorization signed by the seller." There is also a prohibition against showing residential property without such an agreement, but this does not apply to commercial property. The plaintiff neither advertised nor placed a sign on the property. For this reason alone there is no violation of the regulation, and the contract is not shown to be other than a lawful bargain between competent parties. In *Coldwell Bankers–Gordon Co. Realtors v. Roling,* 703 S.W.2d 572, 576 (Mo.App.1986), the court points out that the only matter declared by the regulation to be void and unenforceable is a commission agreement in which the agent does not possess a real estate license. *See also Noss v. Abrams,* 787 S.W.2d 834 (Mo.App.1990).

■ What has been said as to Point I is also applicable to the defendant's Points III and IV. In Point III it is asserted that the verdict directing instruction on Count I is erroneous because it does not require the jury to find that the plaintiff was granted the exclusive right to sell. For the reasons stated in our discussion of Point I, the contract sued on did not call for the plaintiff to seek out purchasers and the element claimed to be omitted was not required. The verdict director is framed in terms of the contract in evidence and no other errors in the text are suggested. The defendant protests the failure to use MAI 29.04, which is a conventional instruction based on the common law of brokers, and, for the reasons above stated, is not appropriate for this case. MAI instructions reflect the law and are not designed to make law or to confine the scope of lawsuits. They reflect the most common fact situations met in litigation, but are not appropriate for many cases, of which this is one. The defendant has not demonstrated error in the verdict director.

Point IV simply protests the refusal of two submitted converse instructions, each of which would have authorized a verdict for the

defendant if the jury believed that "the defendant did not relinquish its right to sell the Forest Park Headquarters Building itself." The discussion of Points I and III shows that the requested converse instructions are not legally sound in the context of this case.

■ Point V requires special discussion. The defendant complains that the verdict director does not call for a finding that the plaintiff was a licensed real estate broker, as required by the instructions in Chapter 29.00 of MAI. No such hypothecation was required, however, because the defendant conceded, during the instruction conference, that there was no issue about the plaintiff's status as a licensed broker. The purpose of instructions is to secure the jury's determination of disputed questions of fact. If an issue is not contested, instruction is neither necessary nor proper.

*Plaintiff's Appeal—Counts II, III, and IV*

■ Plaintiff appeals the trial court's entry of judgment notwithstanding the verdict on Count II.[2] The trial court, during the instruction conference, expressed the thought that the plaintiff had not made a submissible case on Count II, involving the purchase of the Forsythe Plaza property, but followed good practice in submitting the issue to the jury, reserving the question of submissibility for consideration on post-trial motions if the jury found for the plaintiff. This is proper practice which, in our resolution of the case, makes retrial unnecessary.

The court accompanied its ruling granting judgment notwithstanding the verdict on Count II with a memorandum, which we have carefully examined. The memorandum points out that Heimburger made a statement to Sphar that "he would see that Nooney Krombach would be taken care of" with respect to the plaintiff's compensation, but

characterizes the statement as "equivocal, indefinite and constitut[ing] a mere disposition to agree." The court also stated that "there is a complete absence of proof that defendant made any offer or representation to plaintiff that defendant would pay plaintiff compensation in the amount of $800,000.00."

■ Our review is solely on legal issues. The plaintiff has the normal appellant's burden of persuading us that there is error. There is no presumption of correctness of any factual determination by the trial court in granting a judgment notwithstanding the verdict. If there is substantial evidence of all essential elements of a claim the jury has the sole authority to determine the facts. We believe that the trial court circumscribed the authority of the jury too narrowly in its consideration of the discussions between the plaintiff and the defendant after Wilhelm refused, on behalf of Forsythe, to agree to pay a commission to the plaintiff if the Forsythe proposal was accepted.

■ The defendant of course may raise in its points on appeal any legal arguments which it has in support of the judgment, whether or not relied on by the trial court. It argues that any claim that the Exclusive Representation Agreement was modified by one or more subsequent oral agreements is outside the scope of the pleadings. The petition expressly states, however, that the defendant agreed "to pay or cause to be paid to [plaintiff] an additional commission on any ... purchase or lease of a new headquarters building." It is also charged that the defendant is "contractually and legally obligated to pay such commission to" the plaintiff. These are adequate allegations of ultimate fact, alleging that the defendant owes the commissions sought in Count II. Neither the statute of frauds nor the parole evidence rule precludes the modification of

---

2. Plaintiff also asserts error in the trial court's refusal to submit a proposed verdict director and the trial court's entry of a directed verdict on Counts III and IV. Because we are affirming the trial court's judgment as to the sale commission (Count I) and reversing with instructions to reinstate the jury verdict as to the purchase commission (Count II), we need not review the trial court's refusal to submit plaintiff's proposed verdict director on Count II or the directed verdicts

entered on Counts III and IV, plaintiff's alternative claims for quantum meruit on the sale and purchase transactions. Where a party recovers for services rendered upon a theory of express contract (Counts I and II), there cannot also be recovery for the same services upon a theory of quantum meruit (Counts III and IV). *Cf. O'Neal v. Mavrakos Candy Co.*, 255 S.W.2d 138, 140 (Mo.App.1952).

this written contract by subsequent oral agreement. There was no attempt to flesh the allegations of the petition out by motion or interrogatories. There can be no persuasive claim of surprise, because the conversations about the plaintiff's commission were well known to and were testified to by the defendant's executives and former executives who appeared at the trial. Because the ultimate facts are stated in the petition we do not reach the question of trial by express or implied consent, but observe that the claim of a subsequent agreement was mentioned in response to requests for admission and in opening statement, freely mentioned in testimony not consistently objected to, and tested by cross examination. The trial court submitted Count II to the jury and we conclude that the pleading was sufficient, especially after verdict. *Cf. Fallert Tool & Eng'g Co. v. McClain,* 579 S.W.2d 751 (Mo.App.1979).

The record shows three things clearly. First, the defendant considered, at least at the outset, that the plaintiff's services would be valuable to it, and had resort to the plaintiff for advice about the several proposals for a new location, at least through August of 1991, when all offers were still "on the table" and the parties agreed on a six month extension of the exclusive representation agreement. Second, the plaintiff had a great interest in securing its claim to commission and made this interest known to the defendant. Third, the plaintiff had the defendant's entire approval in seeking agreement on the part of prospective developers to pay the plaintiff a commission on consummation of a transaction. Without this assent there would be a problem if the plaintiff, who owed an undivided duty of loyalty to the defendant, were to solicit compensation from a possibly opposing party to a transaction with the defendant. The evidence also shows that Heimburger and Sphar believed that the defendant would bear the ultimate burden of any commission on the purchase of a new facility, however the closing disbursements were structured.

When the plaintiff's approach to Forsythe was rebuffed, it brought the problem to the defendant's attention. When the problem was not resolved, the plaintiff expressed its further concern to Sphar, who discussed it with Heimburger. His statement to her, "that he would see that [plaintiff] would be taken care of" in the event of an agreement with Forsythe, was conveyed by her to plaintiff with his express authority, so that the plaintiff could rely on it and the defendant could be assured of the plaintiff's continued services. The context shows that Heimburger could not have been referring to the $90,000.00 fee, of which several installments had already been paid. The trial court erred in concluding that Heimburger's remarks were equivocal. They were made in response to a direct inquiry about the commission, contingent on consummation of the transaction but quite substantial, and were reported by Sphar to the plaintiff with Heimburger's authority.

■ There is ample support in the case law to show that words such as "I'll take care of it," in response to a definite inquiry, can sufficiently demonstrate an oral contract. *Klaber v. Corp. of Royal Exch. Assur. of London,* 48 S.W.2d 62, 65 (Mo.App.1932); *Ewing v. Dubuque Fire & Marine Ins. Co.,* 237 S.W.2d 498, 500 (Mo.App.1951); *Morris v. Reed,* 510 S.W.2d 234, 239 (Mo.App.1974); *Liberty Hills Dev., Inc. v. Stocksdale,* 742 S.W.2d 209 (Mo.App.1987). The response differs little from a simple "yes." In *Shofler v. Jordan,* 284 S.W.2d 612 (Mo.App.1955), cited by the defendant, the court professed itself unable to determine what would be taken care of by the defendant. In *Dickey Co. v. Kanan,* 486 S.W.2d 33 (Mo.App.1972), also cited by the defendant, there had been no agreement on contract terms. Here the evidence was sufficient to permit the jury to find an undertaking by the defendant to pay the plaintiff a commission of the magnitude previously suggested by the plaintiff to the defendant, and agreed to by other offerors, if the purchase from Forsythe Group went though.

■ The defendant argues that there was no consideration for any agreement by the defendant to assume responsibility for the plaintiff's commission on its acceptance of the Forsythe proposal. The plaintiff points to the contract provision calling for payment of commission by the seller "unless

otherwise agreed by the parties." There is authority supporting modification of matters specifically provided for by contract language, without formal showing of additional consideration. *Ewing*, 237 S.W.2d at 501 (where there was subsequent agreement that the insurance provided in a policy should become effective at an earlier date); *Rufkahr Constr. Co. v. Weber*, 658 S.W.2d 489, 497 (Mo.App.1983) (where the court gave effect to a contemporaneous oral agreement because of a contract provision excusing the presence of a full time superintendent on the job when agreed to by the parties). There is reason to conclude that the provision for modification by agreement was deliberately suggested for this contract by plaintiff in order to permit subsequent agreement about the source of commissions. The defendant was advised about the addition to the language which had been employed in a previous and unrelated agreement between the parties.

The defendant suggests, however, that the language permitting modification is redundant, because the parties to a contract may always agree to modifications if consideration is present. It cites *Gross v. Diehl Specialties Int'l, Inc.*, 776 S.W.2d 879, 883 (Mo.App. 1989), also cited by the plaintiff. That case states that consideration exists for the modification of an executory contract if the modification imposes obligations on both sides and that the modification is not effective in the absence of consideration. *Rufkahr Constr. Co.* and *Ewing*, cited above, do not deal with a general permission for modification by mutual consent, which is perhaps redundant, but with authority for the modification of a particular provision. In this respect they resemble the present case, in which the authority for modification was limited to the source of the plaintiff's commission under the exclusive representation agreement.

We conclude, however, that if consideration is required for the modification, it is present. The parties contemplated that, if the defendant purchased new headquarters property, the plaintiff would receive a substantial commission in excess of the nonrefundable $90,000.00 payment. There would be an anomalous situation if the plaintiff

were to receive a commission only if there were a purchase from any seller other than Forsythe. The defendant might have reason to think that the plaintiff could not give unfettered advice as to the merits of a transaction with Forsythe when considered alongside the other proposals. The plaintiff might have a viable option of terminating its performance under the contract and seeking quantum meruit recovery if the defendant no longer insisted that prospective sellers respect the exclusive representation agreement. By reason of the modification the plaintiff continued its performance without exploring its other alternatives, and the defendant availed itself of the plaintiff's continuing services, which it apparently considered to be valuable. The plaintiff's continuing performance under these circumstances provides ample consideration. Restatement of Contracts Second provides helpful analysis reading as follows:

**§ 89. Modification of Executory Contract**

**A promise modifying a duty under a contract not fully performed on either side is binding**

    **(a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made; or**

  . . . .

    **(c) to the extent that justice requires enforcement in view of material change of position in reliance on the promise.**

  . . . .

**§ 90. Promise Reasonably Inducing Action or Forbearance**

**(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee . . . and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.**

Under the authorities just cited we do not believe that the court was obliged to deny enforcement of the defendant's promise, made to induce reliance on the part of the plaintiff, because of any absence of consideration.

The defendant argues further that there is no evidence that the defendant ever agreed to pay the plaintiff an $800,000.00 commission. What the evidence shows is that the plaintiff decided that it would make no claim for commission from any source in excess of $800,000.00, that the plaintiff advised the defendant of its decision, and that the defendant was agreeable. The defendant soundly argues that any agreement to limit the commission to $800,000.00 would not serve as consideration for Heimburger's undertaking, conveyed to the plaintiff by Sphar, to take care of the commission, because that message had already been delivered when the plaintiff suggested the $800,000.00 ceiling. The effect of the limitation, however, was to liquidate the plaintiff's claim. Heimburger did not expressly indicate how the plaintiff would be "taken care of," but the plaintiff would have been in a position to assert a claim for commission at rates comparable to those to which other offerors had agreed with the defendant's knowledge and approval. Sphar's assent to the limitation, coupled with the defendant's prior undertaking, supplied ample basis for a liquidated claim for $710,000.00 ($800,000.00 minus the $90,000.00 advance).

The plaintiff, therefore, made a case for the jury. Our analysis considers the facts and inferences the jury could have found from the evidence. There are many other considerations and implications in the case, but these are not pertinent to our legal analysis. The trial court did not rule on the motion for new trial as to Count II, and it is therefore deemed overruled in accordance with Rule 78.06. No claim of trial or instructional error as to Count II is preserved for our review

The judgment on Count I is affirmed. The judgment notwithstanding the verdict on Count II is reversed and the case is remanded with directions to reinstate the judgment on the verdict. The reinstated judgment is to bear interest from the date of the verdict.

CRANE, C.J., and AHRENS, J., concur.