# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-2398

_____

Herb Lindsey; Rita Lindsey,     *
                                *
          Appellants,         *
                                *   Appeal from the United States
     v.                             *   District Court for the
                                *   Western District of Missouri.
Jewels by Park Lane, Inc.,      *
                                *
          Appellee.          *

_____

Submitted:  December 16, 1999

Filed:  March 8, 2000

_____

Before BEAM, HEANEY, HANSEN, Circuit Judges.

_____

HEANEY, Circuit Judge.


Herb and Rita Lindsey (the Lindseys) brought suit against Jewels by Park Lane, Inc. (Park Lane) in the district court, claiming that Park Lane breached its oral contract to indemnify them against liability and pay their attorneys fees in an unrelated suit. In the alternative, the Lindseys claimed Park Lane fraudulently misrepresented that it would indemnify them and pay their attorney's fees. The district court, on Park Lane's motion, granted summary judgment with respect to the contract claim. On its own motion, the district court granted summary judgment on the fraudulent

misrepresentation claim. The Lindseys appeal both rulings. We reverse the district court and remand for proceedings consistent with this opinion.


I.


We recite the facts in the light most favorable to the Lindseys. Defendant Park Lane sells jewelry through independent contractors who host sale parties offering Park Lane's wares. Under Park Lane's compensation scheme, these independent contractors receive a commission on sales of Park Lane products. Additionally, an independent contractor could recruit others to become part of their sales team, and would receive a cut of their team members' commissions.

The Lindseys were involved in a similar program with Park Lane's primary competitor, Princess House, Inc. (Princess House). Princess House and Park Lane had previously entered into a consent decree regulating Park Lane's method of recruiting independent contractors. After over fifteen years of service for Princess House, the Lindseys decided to affiliate with Park Lane in 1990, bringing members of their sales team with them. Princess House subsequently brought suit against Park Lane and the Lindseys, alleging violations of the consent decree.

After receiving word of the lawsuit, the Lindseys contacted Park Lane by telephone. Along with the Lindseys, the following individuals were present on the line: Arthur Levin, president of Park Lane; Shirley and Scott Levin, both officers of Park Lane; and Jon Leader and Ed Woods, attorneys with Browne & Woods, the law firm representing Park Lane. The Lindseys expressed their concern about the lawsuit, particularly about paying for the suit. Herb Lindsey spoke with Scott Levin, who told him not worry about the lawsuit. According to Herb Lindsey, when pressed further, Levin stated:

Well, you don't have to worry about anything.  You're a member of the Park Lane family.

. . .

We're going to defend you, whether it costs $7,000 or a million and seven thousand dollars.  It's just a harassment suit.

. . .

We'll indemnify you;  we even might file a counterclaim for you.

(Herb Lindsey Dep. of June 1, 1998, Vol. I at 118 (internal quotations omitted).)

Herb Lindsey further testified that Scott Levin told him that the Lindseys "would need to help prove that he did nothing wrong and so we were going to have to help each other in the times to come and they were going to pay our expenses."  (Id. at 121.)

At some point during this telephone meeting, Herb Lindsey handed the telephone to Rita Lindsey.  Shirley Levin assured her that the Lindseys were a part of the Park Lane family, and that their expenses would be paid for by Park Lane.  Shirley Levin also echoed Scott Levin's sentiments about possibly filing a counterclaim on behalf of the Lindseys.  Further, according to Rita Lindsey, Shirley Levin "indicated to me on early calls that she needed my help in regard to their lawsuit.  That was the agreement, that I would help her out and she would help me out."  (Rita Lindsey Dep. of Aug. 4, 1998, at 162.)

Both of the attorneys present at the initial telephone conference provided deposition testimony.  Ed Woods, a partner with the firm Browne & Woods, was involved in representing both the Lindseys and Park Lane in their suits with Princess House.  According to Woods' recollection, Arthur Levin had on several occasions told the Lindseys that their litigation expenses would be paid for by Park Lane.  In his past

-3-

experience with Park Lane, this would include attorneys fees and any judgment entered against the Lindseys.  Woods further testified:

> Well, I do recall language in which Don and Art [Levin] said – but primarily Art said, "We'll take care of everything.  Don't worry about it. We'll take care of everything.  Your job is to cooperate with the attorneys," meaning, at that point, give information to Jon [Leader] and I, that we need it in order to defend the lawsuit, being the Princess House Park Lane suit, and "get your group together so that they can generate the sales that justify us paying you the money that we're agreeing to pay you."

(Ed Woods Dep. of Apr. 14, 1999, at 18-19.)

In response to further questioning about what type of assistance Park Lane expected of the Lindseys, Woods testified that

> Art [Levin] and Scott [Levin] -- Shirley [Levin] to some extent -- but Art and Scott expressed to the Lindseys their desire that the Lindseys assemble information relating to all the people in their group that had come over to Park Lane that they either preinterview witnesses or make it possible for us to interview witnesses, that they continue to hold their party plan meetings and continue to generate sales, that they provide us with sign-up lists.

> Everything we conceivably needed really rested with the Lindseys because we were talking that the lawsuit involved a contention of Park Lane had recruited the Lindseys and the Lindseys' group in a manner that was allegedly violative of the consent decree.

> . . .

> And Park Lane made it clear that they expected the Lindseys to do that.  Park Lane didn't have the relationship with the Lindseys' people that

would have permitted Park Lane to do it;  so they had to rely on the Lindseys to assist us in preparing the defense.

(Id. at 27-28.)

Jon Leader, an attorney in Woods' firm, testified that at the initial meeting regarding the Princess House litigation it was agreed that "Park Lane would pay the Lindseys' litigation expenses, fees and costs, and also a judgment that was entered, and also provide assistance for the Lindseys and a Cross-Complaint, if they were going to file one against Princess House."  (Jon Leader Dep. of Apr. 13, 1999, at 29.) Subsequent to this meeting, the issue of attorney's fees and indemnity was often discussed, and Park Lane representatives assured that Park Lane would pay the Lindseys' expenses.  Leader recalled one such conversation as follows:

> [I]t was will – "We will" – I don't know that the word "indemnify" was used;  although it may have been.  But, "We will pay your legal expenses."  "You," meaning Park Lane, "will pay the Lindseys' legal expenses.  Park Lane will take care of you.  We'll pay a judgment if one is rendered against you."

(Id. at 37.)

Leader testified in his deposition that he couldn't remember the precise words Park Lane used to assure the Lindseys that Park Lane would pay for the lawsuit, but that phrases used by Park Lane included "We'll pay the judgment;"  "If Princess House wins, we'll take care of you;" and "You don't have to worry about it.  No money will ever come out of your pocket."  (Id. at 239.)  He was certain that the agreement was one in which Park Lane would pay all expenses including the judgment as they became

due, rather than one in which the Lindseys would have to pay the expenses themselves and be reimbursed by Park Lane.

There is evidence in the record that the Lindseys followed through on their obligation to assist in Park Lane's defense. Over an eight month period, the Lindseys collected over one hundred affidavits on behalf of Park Lane. The Lindseys also persuaded six or seven of Rita Lindsey's associates to testify on Park Lane's behalf in a Boston trial. According to Rita Lindsey, "it became, 'Go out and gather witnesses for our case; we need your help in that. Remember, we're paying for your defense.'" (Rita Lindsey Dep. of Aug. 4, 1998, at 184.)

Initially, Park Lane paid the Lindseys' attorney's fees as it had promised. In the Princess House litigation, Park Lane was found to have violated the consent decree. They subsequently stopped paying the Lindseys' litigation costs. Judgment was later entered against the Lindseys, and Park Lane refused to pay the judgment.

## II.

With respect to the contract claim, the district court concluded that there was no contract created by the course of dealings between the Lindseys and Park Lane. It based its decision on two grounds: (1) that there was no mutual agreement on the contract's essential terms; and (2) even if there was an agreement the Lindseys had provided no consideration. The district court based its finding of no mutual agreement on what it considered a lack of detail in the discussions between Park Lane and the Lindseys.

In concluding that the Lindseys provided no consideration to Park Lane in exchange for Park Lane's promise to pay the judgment and attorneys fees, the district court focused on the timing of the Lindseys' promise to assist Park Lane in its suit. Upon reviewing the evidence, the court stated that "[t]here is absolutely no testimony

that [Park Lane] initially told [the Lindseys] it would pay for [the Lindseys'] defense and indemnify them only if [the Lindseys] promised to do something in exchange." Lindsey v. Jewels by Park Lane, Inc., No. 97-1501-CV-W-2, at 20 (W.D. Mo. May 10, 1999) (Order Granting Summ. J.).

The court went on to hold that even if there was a binding contract as to the judgment, it was one for indemnity against loss rather than indemnity against liability. We cannot agree that summary judgment in favor of Park Lane was appropriate on any of these grounds.

Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Union Nat'l Bank v. Federal Nat'l Mortg. Ass'n, 860 F.2d 847, 854 (8th Cir. 1988); accord Tinucci v. R.V. Evans Co., 989 S.W.2d 181, 184 (Mo. Ct. App. 1998) ("Where the evidence regarding a contract is conflicting or is capable of more than one inference, the question raised is one of fact for the trier of fact to determine."). When reviewing a motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party, and accord the nonmoving party all reasonable inferences to be drawn from that evidence. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1996).

A.

In Missouri, in order for a contract to be binding upon the parties, the agreement must be definite enough to allow a court to give it exact meaning, using ordinary canons of construction or by reference to other certainties. See Branson Land Co. v. Guilliams, 926 S.W.2d 524, 526 (Mo. Ct. App. 1996). Still, "[e]ven if a contract is ambiguous, it should not be held void for uncertainty if there is a possibility of giving meaning to the agreement." Id. Moreover, "[d]etermination that an agreement is sufficiently definite is favored in the courts, so as to carry out the reasonable intention

of the parties if it can be ascertained." Maupin v. Hallmark Cards, Inc., 894 S.W.2d 688, 695 (Mo. Ct. App. 1995) (quoting Busching v. Griffin, 542 So.2d 860, 863 (Miss. 1989)).

In Carvitto v. Ryle, a subcontractor, concerned that he would not be paid by the contractor, stopped working on the defendant's home. 495 S.W.2d 109, 111 (Mo. Ct. App. 1973). The defendant, upon seeing this, told the subcontractor, "You boys don't do that. I'll see that you get your money." Id. (internal quotations omitted). Despite the fact that the exchange included no agreed-upon price, payment terms, or completion date, the court held this exchange created an enforceable contract that "the plaintiffs were to finish the job and defendant would see that they got their money. In reviewing this area, *we must take language as it is and people as they are*." Id. at 113 (internal quotations and citations omitted) (emphasis added); see also Woods v. Hobson, 980 S.W.2d 614 (Mo. Ct. App. 1998) (holding enforceable contract existed for repayment of loan despite no discussion of time or term of repayment); Nooney Krombach Co. v. Blue Cross and Blue Shield, 929 S.W.2d 888, 896 (Mo. Ct. App. 1996) ("There is ample support in the case law to show that words such as 'I'll take care of it,' in response to a definite inquiry, can sufficiently demonstrate an oral contract."); Liberty Hills Dev., Inc. v. Stocksdale, 742 S.W.2d 209 (Mo. Ct. App. 1987) (holding that mutual agreement existed when one party, in response to an inquiry about payment, stated "Don't worry, we'll take care of it," despite fact agreement was concededly vague).

Although the terms of this contract are not provided as clearly as the district court may have desired due to the absence of a written agreement, a fact-finder could reasonably conclude the Lindseys struck a bargain with Park Lane that they would help Park Lane in its lawsuit and continue their affiliation with Park Lane in exchange for Park Lane's financial assistance in the Lindseys' lawsuit. The Lindseys expressed their concerns about how they would pay for the lawsuit; in response, Park Lane offered to pay their litigation expenses, including the judgment, provided the Lindseys helped

Park Lane through litigation preparation and continuing to sell its products. Thus, the district court erred in holding the agreement too vague to a be valid contract.

B.

A trier of fact could further determine that the Lindseys provided sufficient consideration to support the agreement. Consideration is an essential element of a contract. See Earl v. St. Louis University, 875 S.W.2d 234, 236 (Mo. Ct. App. 1994).

> Consideration sufficient to support a contract may be either a detriment to the promisee or a benefit to the promisor. The detriment to the promisee may consist of doing anything which he is not legally bound to do or refraining from doing anything which he has the legal right to do.

Id. (citation omitted).

The only evidence in the record as to any pre-existing obligation the Lindseys owed to Park Lane is their respective sales contracts, which list both Herb and Rita Lindsey as independent contractors. Rita Lindsey's contract lists her mission as "solicit[ing] bona fide orders," (Joint App. at 64); Herb Lindsey's contract contains no such requirement. Neither contract details any obligation to continue working with Park Lane for a specified period, nor do they recite any duty to assist Park Lane in litigation.

Both Herb and Rita Lindsey testified that Park Lane made clear that it would pay the Lindseys' litigation expenses, but that in exchange the Lindseys would be required to provide assistance to Park Lane. This sentiment was echoed by both Ed Woods and Jon Leader, attorneys involved in the suit and present during the initial meetings with the Lindseys. The Lindseys did assist Park Lane, and provided valuable resources for Park Lane's defense.

-9-

There is further evidence that Park Lane wanted to be sure that the Lindseys' continued their affiliation with Park Lane. Missouri courts have considered this issue in the past. In Earl, the defendant signed a severance agreement with the plaintiff, Earl, in which Earl was to continue working through a specified date. Later, the defendant claimed no contract was formed because Earl had not provided sufficient consideration. In holding that the severance agreement was a legally enforceable contract, the court reiterated that "[a] promise to continue working by an employee who is under no obligation to remain supplies adequate consideration for a contract with the employer." Earl, 875 S.W.2d at 237; see also Nooney, 929 S.W.2d at 897 (holding "ample consideration" existed to support contract modification where plaintiff continued performing services for defendant without exploring alternatives).

C.

The district court further held that even if an enforceable contract existed, it was one for indemnity against loss rather than indemnity against liability. The primary difference between these two types of indemnity agreements is that in the former (indemnity against loss) the indemnitor only commits to reimburse the indemnitee after the indemnitee pays the amount due, while in the latter (indemnity against liability) the indemnitor is immediately liable for the amounts due, releasing the indemnitee from liability. See Ruysser v. Smith, 293 S.W.2d 930, 933-34 (Mo. 1956). The district court held that because the Lindseys were indemnified against loss only and had not paid any of the outstanding litigation expenses or the judgment against them, they suffered no damages and no action had accrued.

In deciding whether a contract provides for indemnity against loss or indemnity against liability, Missouri requires the contract in question to be read as a whole, and for the arbiter to give consideration "not only to the language of the contract but also to the situation of the parties and the circumstances surrounding them at the time the contract was made." Id. at 934 (internal quotations omitted). A party's use of certain

terms can aid the determination of what type of indemnity was considered by the parties. <u>See</u> <u>Burns & McDonnell Eng'g Co. v. Torson Constr. Co.</u>, 834 S.W.2d 755, 758 (Mo. Ct. App. 1992) (holding contract created indemnity against liability when party agreed to indemnify against "claims," but also created indemnity against loss where when party agreed to indemnify against "losses.")

Here, the language used by the parties and the parties' circumstances could reasonably lead a factfinder to conclude that the contract was for indemnity against liability. The Lindseys contacted Park Lane in response to being served with a lawsuit, and, according to Herb Lindsey, stated to Scott Levin, "My God, we can't afford to defend against a lawsuit." (Herb Lindsey Dep. of June 1, 1998, Vol. I at 118.) In response, Scott Levin, as well as other Park Lane representatives, assured the Lindseys that they would be taken care of and that Park Lane would pay their litigation expenses.

Given the evidence presented by the Lindseys, a trier of fact may well find it improbable that Park Lane was simply assuring the Lindseys that it would pay the Lindseys back if a judgment was entered against them. The Lindseys contacted Park Lane because they did not have the financial resources to defend the suit; they did not state that they had the resources but wanted to be reimbursed. In response, Park Lane assured the Lindseys that they would be taken care of. Park Lane did in fact pay a substantial portion of the Lindseys' attorneys fees early in the lawsuit. Thus, a factfinder could conclude that Park Lane indemnified the Lindseys against liability with regard to their litigation expenses.

The same can be said for the judgment. There is evidence that Park Lane had agreed to pay a judgment in the Lindseys' case, if one should be entered against them. If the Lindseys did not have enough money to defend themselves, it would clearly follow that they could not afford a judgment. This conclusion is buttressed by the testimony of Jon Leader, who stated that Park Lane assured the Lindseys that Park

-11-

Lane would pay a judgment if one was entered against the Lindseys.[1]  Ed Woods testified that Park Lane had assured the Lindseys that Park Lane would take care of everything, and that in his experience with Park Lane, this included any judgment rendered.  Thus, the district court erred in holding that as a matter of law the agreement was to indemnify the Lindseys against loss only.

III.

The Lindseys claimed that if no enforceable contract existed, Park Lane had fraudulently misrepresented to them that it would pay for the Lindseys' litigation expenses and any judgment rendered against the Lindseys.  After granting summary judgment in favor of Park Lane on the contract claim, the court, on its own motion and without notice to the parties, granted summary judgment to Park Lane on the fraudulent misrepresentation claim.  We need not belabor this point, as a sua sponte grant of summary judgment is appropriate only when the party against whom judgment will be entered is given sufficient advance notice and an adequate opportunity to respond, see Hobbs v. Lockhart, 46 F.3d 864, 868 (8th Cir. 1995), unless the losing party has failed to state a claim, see Enowmbitang v. Seagate Tech., Inc., 148 F.3d 970, 973 (8th Cir. 1998).

Here, the district court held that its finding that the Lindseys had suffered no damage because their indemnity was against loss would be dispositive of the Lindseys' fraud claims.  Because we have reversed the district court with respect its indemnity

---

[1]The district court appeared concerned with minor inconsistencies in Leader's deposition testimony.  Upon review of the record, paying particular attention to the context of these inconsistencies, we do not believe that they rise to the level of contradictory statements.  Leader was giving a deposition in 1999 about events that occurred in 1990.  Thus in considering the inconsistencies in Leader's testimony, the district court should have credited Leader's own statement that "it's hard to remember the details of something that happened in 1990 . . . ."  (Leader Dep. at 22.)

finding, the fraud claims should not be dismissed on this ground.  We further hold that the Lindseys were not provided adequate notice or an opportunity to respond to the district court's summary judgment motion, and that, after a careful review of their allegations, the Lindseys' fraud claim states a claim upon which relief could be granted. Accordingly, we reverse the district court's sua sponte grant of summary judgment on the Lindseys' fraud claim.

## IV.

For the reasons stated above, we reverse the district court's grant of summary judgment on the Lindseys' contract and fraudulent misrepresentation claims, and remand for proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.