

# In the Missouri Court of Appeals
## Eastern District
### DIVISION TWO

| | | |
|---|---|---|
| ARKANSAS-MISSOURI FOREST PRODUCTS, LLC, | ) ) ) | No. ED102321 |
| Plaintiff/Appellant, | ) ) | Appeal from the Circuit Court of Cape Girardeau County |
| vs. | ) ) | |
| STUART J. LERNER, *et al.*, | ) ) | Honorable Benjamin F. Lewis |
| Defendants/Respondents. | ) | Filed: January 19, 2016 |

## I. Introduction

Plaintiff Arkansas-Missouri Forest Products, L.L.C. ("Ark-Mo") appeals from the trial court's judgment notwithstanding the verdict ("JNOV") that set aside the jury's verdict in favor of Ark-Mo on Ark-Mo's breach of contract claim against Stuart Lerner ("Lerner"). The jury awarded Ark-Mo $2,169,398 in damages. Ark-Mo also appeals from the trial court's judgment in favor of defendants on Ark-Mo's claim for an accounting. We reverse the JNOV in favor of Lerner and remand for entry of judgment against Lerner in accordance with the verdict. We also reverse the trial court's judgment in favor of defendants and against Ark-Mo on Ark-Mo's claim for an accounting and remand with instructions.

## II. Factual Background

In reviewing a JNOV, we consider the evidence and reasonable inferences favorable to the jury verdict and disregard contrary evidence that does not support the verdict. *Kasal v. Freihaut*, 860 S.W.2d 24, 25 (Mo. App. E.D. 1993). Viewed in this light, the evidence was as

1

follows: Ark-Mo is a Missouri company owned by Mark Garnett ("Garnett") and Diann Garnett.[1] The Garnetts use Ark-Mo as their investment vehicle through which they own interests in certain businesses, including those at issue in the underlying litigation. The Garnetts also own an interest in Garnett Wood Products, a company that sells wood and nails for use in the manufacture of pallets. Garnett has been involved in the pallet business for a long time.

When Lerner, a California resident, met Garnett in 1987, Lerner had just formed L&M Pallet, which started manufacturing white pallets. Lerner purchased substantial amounts of wood from Garnett Wood Products on behalf of L&M Pallet through word of mouth about Garnett. Garnett extended "a lot of credit" to Lerner because L&M Pallet was a growing company and it was difficult for Lerner to get credit in California. Lerner and Garnett transacted their business without formal documentation. Over time, Garnett and Lerner became good friends and their families spent time together regularly. Lerner attended the Garnetts' annual deer hunting events.

After Lerner sold L&M Pallet in 1994, Lerner began working with CHEP USA ("CHEP"), which owns and leases blue wooden pallets[2] to its customers. Lerner formed Blue Chip Manufacturing in California to operate a manufacturing facility for CHEP. From 1998 to 2002, Lerner manufactured for CHEP blue pallets which were mostly consumed in the west coast. During this period, Garnett Wood Products sold lumber and nails to various companies including CHEP and Blue Chip Manufacturing. By 2002, the blue pallet market in the west coast became saturated and the need for Blue Chip Manufacturing to produce pallets for CHEP declined. In 2000, Garnett and Lerner already knew that the west coast market for CHEP pallets would become saturated. Accordingly, they started discussing various scenarios to further their business together, including potentially manufacturing pallets for CHEP in the central and east

---

[1] Both parties concede that Garnett is an authorized agent for Ark-Mo.

[2] CHEP pallets are known as blue pallets because of their blue color, distinct from white wooden pallets Lerner had manufactured at L&M Pallet. Blue pallets were deemed to be of better quality than white pallets.

coast regions. In these discussions, Lerner told Garnett that, if they "could do something with CHEP," Lerner would split any profits 50-50 with Garnett. Nothing developed with CHEP in 2000.

In 2003 and 2004, Garnett and Lerner met with representatives of CHEP and discussed the advantages to CHEP of a centralized manufacturing location in the Midwest. A CHEP manufacturing facility in the Midwest would allow Garnett and Lerner to take advantage of Garnett's presence and knowledge of the pallet business in the Midwest and concurrently satisfy CHEP's desire to expand its business in the central and east coast regions. Garnett was actively involved in their discussion with CHEP regarding such facility in the Midwest. Garnett and Lerner also agreed that Garnett, through Ark-Mo, would be "the one who's going to have to take care of the day-to-day operation of the plant" since Lerner did not want to move to the Midwest. Since 2000, Garnett and Lerner had not discussed further what their respective ownership interests would be in any future projects with CHEP. However, Lerner told Garnett that they would be partners. The representatives of CHEP also knew them as partners in their dealings with CHEP.

After Garnett, Lerner, and the representatives of CHEP actively searched for a location for a CHEP manufacturing facility in the Midwest, they found a desirable location in Southaven, Mississippi. Garnett, Lerner, and CHEP agreed that the pallet manufacturing facility would be owned by CHEP and operated by Lerner and Garnett's jointly-owned business. In spring of 2005, Garnett and Lerner met with James Harper ("Harper"), an attorney in Southaven whom Lerner had hired to prepare the organizational documents for Blue Chip II, L.L.C. ("BC II"), the entity that would contract with CHEP to manage the Southaven facility. Based on their prior conversations about partnering to work with CHEP, Garnett believed that Ark-Mo would have a

3

50% ownership interest in BC II. However, the organizational documents prepared by Harper at Lerner's direction gave L&M Ventures ("L&M," Lerner's investment company) a 65% ownership interest in BC II, Lerner's brother a 5% interest, and Ark-Mo a 30% interest. Although Garnett was surprised, he did not say anything in Harper's office because he wanted to think about the situation before he reacted.

Upon exiting Harper's office, Garnett expressed his disappointment and asked Lerner why he had allocated Ark-Mo only 30% of BC II when the promise was "50-50." In response, Lerner told Garnett that his brother, an attorney, told him that it was necessary. Garnett asked Lerner whether the interest allocation would be the same for "every CHEP venture from now on other than the things [they were] already doing." Lerner said yes and they "shook hands" (the "Parking Lot Deal"). Garnett did not document this agreement because he and Lerner had relied on oral agreements in the past. In April of 2005, Ark-Mo, L&M, and Lerner's brother executed the BC II Operating Agreement. Proportionate to their respective interests, Ark-Mo paid $45,000 for its 30% share in BC II and L&M paid $105,000 for its 65% share.

During the preparation for and start-up of the Southaven facility, Garnett was regularly on site dealing with various aspects of the permitting and organization of the operation. Ray Garza, Lerner's employee who had experience at Blue Chip Manufacturing, was brought in to help set up the Southaven facility. The facility opened in April, 2005.

In early May of 2005, BC II hired Robert Gossett ("Gossett") to work as on-site manager of the operations in Southaven. As a result of Gossett's hiring, Garnett no longer needed to be constantly in Southaven. Garnett went to Southaven once a week but continued to receive and monitor daily production reports and stayed involved in the operations. Lerner was in Southaven

for quarterly meetings, but infrequently beyond that. The Southaven operation was very successful.

In late 2005, Garnett visited a CHEP repair facility in Florida. Garnett's inspection revealed that the repair facility was a "mess" with "a lot of problems." Garnett suggested to Lerner that they offer to help CHEP improve its Florida repair facility. Lerner was at first reluctant, but was persuaded by Garnett. Garnett and Lerner helped CHEP improve the Florida repair facility and CHEP was satisfied with the result. CHEP later contacted Lerner about taking over management of CHEP's repair facility in Pico Rivera, California, which was experiencing production and management problems. Lerner was reluctant to become involved in managing the Pico Rivera CHEP facility (the "Pico Rivera") because of his prior negative experience with the pallet repair industry in California. To persuade Lerner, Garnett recommended to Lerner that they provide their management services on a cost-plus basis so that their financial risk in the operation was reduced. Garnett eventually persuaded Lerner by stating that management of the Pico Rivera was an opportunity they should pursue.

During the first quarter of 2006, Garnett was actively involved in the discussions and communications about taking over the management of the Pico Rivera. Lerner asked Garnett to review the plant layout of the Pico Rivera and various things that needed to be done. Lerner also asked Garnett to come to California to inspect the Pico Rivera. Lerner copied Garnett on numerous communications Lerner exchanged with CHEP regarding the Pico Rivera. Garnett was involved with various tasks necessary to facilitate the operation of the Pico Rivera, from getting an environmental and safety study done and obtaining permits for the Pico Rivera to designing the layouts of the plant.

To take over the operation of the Pico Rivera, Lerner prepared to form Blue Chip Recycling, L.L.C. ("BCR"). Lerner informed Garnett that Lerner planned to give Ark-Mo a 5% interest in BCR because Lerner did not need Garnett in California. However, Garnett assumed Ark-Mo would receive a 30% interest in BCR based on the Parking Lot Deal which did not limit their "venture with CHEP" to a specific geographic area or to manufacturing only. Not satisfied with Lerner's plan, Garnett sent Lerner an email on March 15, 2006, stating that the 5% was not the agreement they had reached and that he was not happy with not being given the opportunity to learn the recycling business. Garnett stated,

> "[F]rom the beginning of BC II, my understanding has been that we are all in this together. How does it help [me] if all the new operations – for CHEP – that our group is involved with are on the West Coast and [I] have a very minimal stake in those operations? Aren't we all supposed to make money from whatever this group does?"

Garnett further stated, "This move into recycling started because I had the presence of mind to point out that the [Florida repair facility] was not working properly and to ask [a representative of CHEP] if he needed our help." Garnett also emphasized that he "had to do some big time convincing to even get [Lerner] to look at the idea." Garnett proposed a 12.5% interest in BCR for Ark-Mo, acknowledging that Lerner needed to have the controlling share, 67.5%, and that Ray Garza and Gossett also needed a share, 10% each, for their involvement in BCR.

Subsequently, Lerner called Garnett, rejecting Garnett's proposal and reconfirming the original proposal of a 5%, explaining again that he did not need Garnett in California. Garnett again protested the idea of a 5% stating, "[T]hat's not fair. That wasn't our agreement." Lerner responded, "[W]ell, that's just the way it's going to be." After thinking about the situation for a couple of days, Garnett called Lerner back.[3] Garnett asked Lerner, "[I]f you come to the

---

[3] Garnett's and Lerner's testimonies do not provide when this phone conversation took place. However, the testimonies establish that the phone conversation took place after Garnett's email to Lerner, proposing a 12.5%

[M]idwest, where you may or may not need me, what else we do is going to be 30 percent from then on?" Lerner responded, "[W]hen we come to the [M]idwest, you'll get your full 30 percent share." Garnett accepted Lerner's proposal of a 30% interest in future CHEP projects in the Midwest because he thought "that's the best [he] could get at that point" (the "Telephone Deal").

At some point during the parties' exchanges regarding Ark-Mo's ownership interest in BCR, Garnett stated, "[I]f [I was] only going to get five percent, [I] didn't want to be part of [BCR]." Although Garnett thought he was entitled to an ownership interest in BCR, he made no further demand that Ark-Mo be given an ownership interest in BCR.[4] BCR was formed without Ark-Mo as its member in May, 2006. Ray Garza and Gossett were each given a 10% interest and Lerner Children's Trust was given a 12.5% interest.

In January of 2006, Garnett, Lerner, and Gossett met at Harper's office to discuss the formation of Blue Chip III, L.L.C. ("BC III") to take advantage of possible additional opportunities with CHEP in the Midwest. In the meeting, Garnett proposed possibly splitting Ark-Mo's ownership interest in BC III with Gossett because of Gossett's anticipated involvement in BC III. On March 30, 2006, Harper sent Lerner a letter enclosing the Certificate of Formation for BC III and copied Garnett on the letter without including the enclosure.

Subsequent to the January 2006 meeting at Harper's office, Garnett and Lerner acted as if Ark-Mo had an ownership interest in BC III. In April of 2006, Garnett contacted his accountant to ask about possible tax implications of giving Gossett an ownership interest in BC III. Garnett forwarded the accountant's answers to Lerner. In his reply, Lerner stated, "I appreciate your accountants but I don't think they apply to us" because "[BC III] is a new company . . . . has no

_____

interest in BCR, which was March 15, 2006. Therefore, it is reasonable to infer that this particular phone conversation took place sometime in the latter part of March.

[4] A 30% interest in BCR would have been worth over $6 million; a 5% interest would have been worth approximately $1 million.

[v]alue." Garnett was also involved in the conversations where Lerner offered Gossett an ownership interest in BC III. In an email of April 15, 2006, addressed to both Garnett and Lerner, Gossett rejected the offer by stating, "[Lerner]/[Garnett], it will be better for me and my family to not have an ownership position in [BC III] . . . ."

In 2006, after Lerner and Garnett's lobbying, CHEP decided to lease the rest of the available space at the Southaven facility for use as a repair/recycling facility and hired Lerner to work on the repair facility. BC III was formed to run the repair/recycling facility in the Southaven facility. The repair facility managed by BC III began operating in early 2007.

In 2006, CHEP was also looking into opening up a second site for manufacturing new pallets near Ohio and requested "Blue Chip" to look for the site. At Lerner's request, Garnett participated in identifying and evaluating Midwest locations for a possible CHEP facility. Eventually, CHEP decided not to pursue an additional facility in any of those locations.

During this time, Garnett expected to receive a 30% interest in BC III because it was the first project back in the Midwest after the Telephone Deal. However, in late 2006 and early 2007, Garnett could not reach Lerner by phone when Garnett attempted to ask Lerner about the status of the BC III operating agreement. Garnett eventually called Harper in early 2007 and inquired about the operating agreement. Harper told Garnett that Ark-Mo was not in the BC III Operating Agreement and had no ownership interest in BC III. Harper stated that Lerner had directed him to remove Ark-Mo from the BC III Operating Agreement. Garnett then spoke to Lerner in April of 2007 about Lerner's promise of 30% of CHEP projects in the Midwest. Lerner responded that Garnett was not getting anything.

At the annual deer hunting event at Garnett's property in Missouri in November of 2007, Garnett confronted Lerner about his failure to include Ark-Mo in BC III as agreed upon. Garnett

8

told Lerner that Lerner needed to make him whole in some way for his "forced non-participation in the various operations that have been established under the Blue Chip name subsequent to the startup of [BC II]." Lerner responded that he would talk to his brother and get back to Garnett with regard to Garnett's demand.

In December of 2007, Lerner emailed Garnett, offering to resolve the dispute by selling Garnett a 10% non-voting interest in BC III for $75,000. In response, Garnett offered to pay $25,000 for a 10% voting interest in BC III. The negotiations between Lerner and Garnett continued during the first six months of 2008. However, the parties were unable to resolve the dispute and Lerner withdrew his offer to sell Ark-Mo a 10% non-voting interest in BC III in an email dated June 22, 2008.

On June 16, 2008, Lerner formed Blue Chip Mid-West, L.L.C. ("BC Midwest") to operate a recycling facility for CHEP in Jackson, Missouri. BC III had a 65% ownership interest in BC Midwest.

On April 17, 2009, Ark-Mo sued Lerner, L&M, BCR, BC II, BC III, and BC Midwest, alleging various claims against these defendants, including claims for breach of contract, breach of fiduciary duty, fraud, and an accounting. In the course of the litigation, Ark-Mo amended its petition, eventually filing its Fourth Amended Petition (the "Petition") on July 2, 2012. The Petition was the operative petition at the time of trial in 2014. Prior to trial, the trial court granted summary judgment on several of Ark-Mo's claims, including claims against BC II, BC III, BCR, and BC Midwest. The case proceeded to trial on the claims against Lerner, L&M, and BC II (on the accounting claim).

At trial, CPA Mark Hoffman ("Hoffman") testified about the damages suffered by Ark-Mo as a result of Lerner's breach of oral contract. Based on financial information regarding the

9

various Blue Chip entities, Hoffman testified that, had Lerner not breached the contract, Ark-Mo would have received in distributions, including interest, approximately $5 million based on a 30% interest in BC III. Hoffman also testified regarding what Ark-Mo's distributions would have been based on its 15%, 12.5%, and 10% interests in BC III. Lerner did not present his own damage expert. Lerner testified neither the Parking Lot Deal nor the Telephone Deal ever existed.

At the end of the trial, two claims were submitted to the jury: Ark-Mo's claim for breach of fiduciary duty against L&M and Ark-Mo's claim for breach of contract against Lerner. Ark-Mo's claim for breach of contract against Lerner was set forth in Ark-Mo's verdict director, Instruction No. 12, as follows:

> Your verdict must be for [Ark-Mo] if you believe: First, [Ark-Mo] and [Lerner] entered into an agreement whereby [Ark-Mo] agreed to forego an ownership interest in [BCR] and [Lerner] agreed that [Ark-Mo] would have a 30% ownership interest in future [Lerner] and [L&M] opportunities with CHEP in the Midwest; Second, [Ark-Mo] performed its agreement; Third, [Lerner] failed to perform his agreement; and, Fourth, [Ark-Mo] was thereby damaged.

After hearing arguments, the trial court denied defendants' motions for directed verdict on both of the claims. The jury returned a verdict in favor of L&M on Ark-Mo's claim for breach of fiduciary duty, and a verdict in favor of Ark-Mo on its claim for breach of contract against Lerner, awarding $2,169,398 in damages.

Subsequent to the jury verdict, Ark-Mo filed a supplemental motion for an accounting, supplementing its claim of an accounting in the Petition. Lerner filed a motion for JNOV and motion for a new trial. After a hearing on the motions, the trial court entered an interlocutory order for an accounting as to BC II. Lerner, L&M, and BC II then filed a motion to reconsider the interlocutory order, which the court denied. Those defendants filed a second motion to reconsider the interlocutory order for an accounting.

On November 20, 2014, the trial court granted Lerner's motion for JNOV and entered a judgment in favor of Lerner on Ark-Mo's claim for breach of contract, concluding that Ark-Mo failed to prove a submissible case against Lerner. The trial court also granted the defendants' second motion to reconsider the interlocutory order for an accounting, entering judgment against Ark-Mo on the accounting claim. The trial court did not conditionally rule on Lerner's motion for new trial. Ark-Mo appeals.

## III. Discussion

Ark-Mo raises seven points of error on appeal. For ease and clarity of our analysis, we review these points in group.

### A. JNOV - Breach of Contract Claim

In Point I, Ark-Mo argues the trial court erred in granting Lerner's motion for JNOV because Ark-Mo had made a submissible case for breach of contract by proving with substantial evidence that Lerner orally agreed Ark-Mo would receive 30% ownership interests in future projects together with CHEP in the Midwest. In Point II, Ark-Mo argues the trial court erred in granting Lerner's motion for JNOV because there was sufficient evidence of consideration to support the oral contract. We agree.

#### 1. *Standard of Review*

A trial court's decision to grant a motion for JNOV is reviewed to determine whether a plaintiff made a submissible case. *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 39 (Mo. App. E.D. 2013) (internal citation omitted). To make a submissible case, the plaintiff must present substantial evidence for every fact essential to recovery. *Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 315 (Mo. App. W.D. 2004), *as modified* (Nov. 23, 2004). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of

11

fact can reasonably decide a case." *Moore ex rel. Moore v. Bi-State Dev. Agency*, 87 S.W.3d 279, 286 (Mo. App. E.D. 2002). The determination of whether a submissible case was made is a question of law that we review *de novo*. *Delacroix*, 407 S.W.3d at 39.

We view the evidence and all inferences drawn therefrom in the light most favorable to the verdict and will affirm the grant of a JNOV only if we find that a submissible case was not made. *Id.* We presume that the plaintiff's evidence is true. *Eidson v. Reproductive Health Services*, 863 S.W.2d 621, 626 (Mo. App. E.D. 1993). "Factual issues not submitted to the jury through instructions are taken to have been found in a manner consistent with the verdict." *Nooney Krombach Co. v. Blue Cross & Blue Shield of Missouri*, 929 S.W.2d 888, 890 (Mo. App. E.D. 1996). A JNOV is a drastic action that can only be granted if reasonable persons cannot differ on the disposition of the case. *Id.* Moreover, there is a presumption favoring the reversal of a JNOV, and we will not overturn a jury verdict unless there is a complete absence of probative facts to support the verdict. *Id.*

## 2. *Submissibility of the Case*

In order to make a submissible case for breach of contract, a plaintiff must establish: (1) a mutual agreement between parties capable of contracting; (2) valid consideration; (3) mutual obligations arising out of the agreement; (4) part performance by one party and prevention of further performance by the other; and (5) damages resulting from the breach of contract. *Intertel, Inc. v. Sedgwick Claims Mgmt. Servs., Inc.*, 204 S.W.3d 183, 202 (Mo. App. E.D. 2006); *Smith Moore & Co. v. J.L. Mason Realty & Inv., Inc.*, 817 S.W.2d 530, 532 (Mo. App. E.D. 1991). Accordingly, Ark-Mo must present substantial evidence to support each element. Because the last two elements - breach and damages - are not disputed, our analysis will focus on the first three elements.

12

(1) Mutual Agreement between Parties

Lerner asserts Ark-Mo did not make a submissible case for breach of contract because there was no evidence of mutuality of agreement regarding the essential terms of the Telephone Deal. Lerner argues the Telephone Deal between Lerner and Ark-Mo was nothing more than "a promise to negotiate further deals in the 'future.'" We disagree.

To show mutuality of agreement, a plaintiff must show that the terms of the contract are certain or capable of being made certain. *Tom's Agspray, LLC v. Cole*, 308 S.W.3d 255, 259 (Mo. App. W.D. 2010). "[T]he terms of agreement must be sufficiently definite to enable the court to give it an exact meaning." *Bldg. Erection Servs. Co. v. Plastic Sales & Mfg. Co.*, 163 S.W.3d 472, 477 (Mo. App. W.D.2005). We look at the intentions of the parties, as expressed or manifested by their words or acts to determine if there was mutual assent to the terms. *Id.*; *Birkenmeier v. Keller Biomedical, LLC*, 312 S.W.3d 380, 392 (Mo. App. E.D. 2010). "[W]hat a person may have intended subjectively is not controlling." *Silver Dollar City, Inc. v. Kitsmiller Const. Co.*, Inc., 931 S.W.2d 909, 914 (Mo. App. S.D. 1996). "The standard is what a reasonably prudent person would be led to believe from the actions and words of the parties and this is a question to be resolved by the trier of fact." *Id.*

After reviewing the record on appeal in the light most favorable to the jury verdict, we do not find a complete absence of probative facts that could support a finding that mutuality of agreement existed between the parties. There was substantial evidence in the record to establish that the terms of the Telephone Deal were capable of being made certain and that there was a meeting of minds between the parties regarding Ark-Mo's ownership interests in future projects with CHEP in the Midwest. The terms of the Telephone Deal were that Ark-Mo would be entitled to a 30% ownership interest in future projects with CHEP in the Midwest and that, in

13

return, Ark-Mo would not pursue an ownership interest in BCR. These terms are sufficiently definite to enable us to give it an exact meaning.

There was evidence at trial from which the jury could reasonably determine that the Telephone Deal was based upon the parties' long history of pursuing business together. Garnett testified in length about the nature and extent of his involvement in pursing CHEP businesses together with Lerner, including the formation of BC II, BCR, and BC III. Lerner characterized Garnett's involvement as stemming from Garnett's own desire to learn the pallet business and Lerner's kindness as a friend in teaching Garnett the business. Lerner testified that Garnett fabricated the Parking Lot Deal and the Telephone Deal. Lerner further testified that all the CHEP projects were "Stu Lerner's deal where Stu Lerner can make the business whatever name he wants it to be and could decide who was going to be part of it and who wasn't going to be part of it."

However, there was substantial evidence to the contrary which we presume is true. *Eidson*, 863 S.W.2d at 626. After the Parking Lot Deal where Lerner and Garnett agreed that Ark-Mo would receive 30% of future business done together with CHEP, both parties manifested and acted as if they were partners in pursuing CHEP projects. It was Garnett who visited CHEP's repair facility in Florida and suggested to Lerner that they offer their help to CHEP to improve the facility. When CHEP asked Lerner to assume management of CHEP's repair facility in Pico Rivera, it was Garnett who convinced Lerner, who was reluctant, that it was the opportunity they should pursue together on a cost-plus basis to minimize financial risks of the operation. Lerner himself included Garnett throughout the process of taking over the management of the Pico Rivera. Lerner asked Garnett to review the plant layout of the Pico Rivera. Lerner also asked Garnett to come to California to inspect the Pico Rivera. Lerner

14

copied Garnett on numerous emails Lerner exchanged with CHEP regarding the Pico Rivera. Garnett was involved with various tasks necessary to facilitate the operation of the Pico Rivera, from getting an environmental and safety study done and obtaining permits for Pico Rivera to designing the layouts of the plant. In particular, Garnett directly exchanged emails with a CHEP representative in having the environmental and safety study done.

Likewise, throughout the process of forming BC III, Lerner and Garnett acted as if Ark-Mo had an ownership interest in BC III. Lerner and Garnett went together to Harper's office in January of 2006 to discuss the formation of BC III. They discussed the possibility of splitting up Ark-Mo's 30% ownership interest with Gossett since Gossett was going to be working on the operation of BC III. After the Telephone Deal occurred, Lerner and Garnett continued to act as if Ark-Mo had an ownership interest in BC III. This is evidenced by Garnett's email to Lerner regarding the comment of Garnett's accountant about "our plan to move stock to [Gossett]." Lerner's reply email did not dispute any of Garnett's language, including "*our* plan." Furthermore, when Gossett turned down the offer of an ownership interest in BC III, he specifically addressed both Garnett and Lerner in his email. Garnett was also involved in lobbying CHEP representatives to lease a part of the Southaven facility for use as a CHEP repair facility for which BC III was eventually formed to operate.

The foregoing evidence was sufficient as a whole for the jury to determine that (1) Lerner and Garnett first agreed that Ark-Mo would have a 30% ownership interest in future CHEP projects, (2) they later changed their agreement to give Ark-Mo a 30% ownership interest in future CHEP projects in the Midwest and Ark-Mo would not pursue an ownership interest in BCR, and (3) the parties' actions from the formation of BC II until BC III was formed were consistent with those agreements. A reasonably prudent person would be led to believe from the

actions and words of Lerner and Garnett that the parties intended those agreements to exist between them. Accordingly, there is substantial evidence, with probative force upon the issue of whether there was a meeting of minds between the parties, from which the jury could have reasonably decided the case.

Lerner argues that the terms of the contract were not definite because the contract did not specify the price that Ark-Mo was supposed to pay for its 30% ownership interest in future CHEP projects. Lerner further argues that other essential terms were also missing, such as what future CHEP projects would entail, whether Ark-Mo's 30% interest would be voting or non-voting, where the term "Midwest" would encompass, who else would be involved in future CHEP projects, what type of business structure would be formed to operate future CHEP projects, what type of work would be performed by the members of the businesses, how much any members of the businesses would be paid for their salaries, and when and if distributions were to be made. We disagree.

The fact that some terms of an agreement were not capable of ascertainment at the time the agreement was entered into and these precise terms were to be determined by mutual agreement in the future when they became ascertainable does not make the contract unenforceable. *Smith Moore*, 817 S.W.2d at 533. At bottom, "[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left." 1 CORBIN ON CONTRACTS (1963) § 95, p. 400.

With the standards in mind, we find that the terms of the Telephone Deal, which Lerner characterizes as fatally uncertain and indefinite, were made sufficiently certain and were

16

supported by evidence at trial. As the parties' words and acts expressed and manifested their intention, the parties pursued CHEP business together with a certain framework of ownership interests. When the parties entered into the Telephone Deal, however, the price Ark-Mo would have to pay for its 30% ownership interest in a CHEP project was not capable of ascertainment because the capital needs for a future CHEP in the Midwest could not be identified at that time.

Rather, the price of the 30% ownership interest in a CHEP project could have been reasonably ascertained pursuant to the parties' past formula for determining a dollar amount of the investment for BC II once the specific capital needs for the project were identified. Under the formula, Ark-Mo's capital investment payment for its interest in a future CHEP project would be proportional to the amounts paid by L&M and any other persons getting an ownership interest in the entity formed for the project. In other words, if L&M had a 65% interest and Ark-Mo a 30% interest, then, Ark-Mo's price for investment would be 46% of L&M's price. Lerner does not cite, and we do not find, any legal authority providing that, in a contract for a percentage of ownership interest, a dollar amount of capital investment is an essential term which needs to be ascertained at the time of contracting.[5]

Likewise, the fact that the Telephone Deal was without detailed terms, such as what a future CHEP project would encompass, who would be involved in a project, what business structure would be used, and what salary a member would be paid, does not make the contract too uncertain and indefinite to be enforced. Although an oral contract's terms must be definite, those terms need not always be detailed. *Sportsman v. Halstead*, 147 S.W.2d 557, 452 (Mo.

---

[5] Lerner relies on *Frick's Meat Products, Inc. v. Coil Constr. of Sedalia Inc.*, 308 S.W.3d 732, 738 (Mo. App. E.D. 2010), to argue that the parties to a contract must agree on a definite price in order for the contract to be enforceable. However, Lerner's reliance on *Frick's Meat Products* is misplaced. In that case, the price term was essential because it was the legal consideration in the contract. The contract there was a construction contract on building a ham processing plant. Unlike a contract for allocating an ownership interest in a venture, the price for the subject matter to be built in a construction contract is an essential term. Furthermore, in *Frick's Meat Products*, the price was specified as a part of the contract and was disputed between the parties. *Id.* Here, the price for Ark-Mo's 30% ownership interest was not specified as a part of The Telephone Deal or The Parking Lot Deal.

1941). Considering the evidence of the parties' prior dealings and conduct as a whole, the terms of the Telephone Deal are sufficiently definite without those detailed terms. The terms are that Ark-Mo would not pursue any claim of ownership interest in BCR but that Ark-Mo would receive a 30% ownership interest in future CHEP projects done together in the Midwest. The absence of the detailed terms did not render this basic agreement between the parties indefinite. Further, the detailed terms are capable of being ascertained in the future, based on the parties' prior conduct and reasonable business practices.

Lerner also argues that the term Midwest is indefinite. We disagree. "[U]ncertainty and indefiniteness are matters of degree." *Bldg. Erection Servs. Co. v. Plastic Sales & Mfg. Co.*, 163 S.W.3d 472, 477 (Mo. App. W.D. 2005). "In determining whether the terms of an agreement are too uncertain to create an enforceable contract, a court is guided by principles of law applied with common sense and in the light of experience." *Id.* "A contract should not be held void for uncertainty unless there is no possibility of giving meaning to the agreement." *Id.* (citations omitted). The evidence at trial was sufficient for the jury to decide what the term Midwest meant. Lerner himself used the term Midwest when he testified that CHEP was looking for a "Midwest" location for a manufacturing facility, which later became located in Southaven. Therefore, it was possible for the jury to give meaning to the term Midwest as reasonably including Southaven where the CHEP repair facility for which BC III was formed to operate was located.

Viewing the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we find that Ark-Mo presented sufficient evidence from which a reasonable juror could find that there was mutual agreement between the parties regarding Ark-Mo's 30% ownership interests in their future CHEP projects in the Midwest.

<u>(2) Valid Consideration</u>

Lerner next asserts there was no evidence of legal consideration for the Telephone Deal. Lerner argues that Garnett did not specifically testify that he agreed to "forego" an ownership interest in BCR in exchange for a 30% ownership interest of future CHEP projects in the Midwest. Lerner also argues that Ark-Mo had neither the existing ownership interest nor the right to an ownership interest in BCR to forego. Lerner adds that he personally received no right, interest, profit, or benefit under the Telephone Deal. We disagree.

Consideration "may consist of some right, interest, profit, or benefit accruing to one party, or some forbearance, loss, or responsibility given, suffered, or undertaken by the other party." *Walker v. Rogers*, 182 S.W.3d 761, 770 (Mo. App. W.D. 2006) (citation omitted). "Consideration exists where there is a detriment to the promisee or a benefit to the promisor." *Id.* "Detriment to a promisee may consist of doing anything he is not legally bound to do or by refraining from doing anything he has a right to do." *Moore v. Seabaugh,* 684 S.W.2d 492, 496 (Mo. App. E.D. 1984). "Consideration may be found if a promisee in reliance on a new promise changes his or her position." *Carter v. St. John's Regional Medical Center*, 88 S.W.3d 1, 10 (Mo. App. S.D. 2002).

Here, substantial evidence and reasonable inferences exist from which a jury could find that the Telephone Deal was supported by valid and sufficient consideration. Pursuant to the Parking Lot Deal, Lerner and Garnett agreed to share profits and losses in their future projects with CHEP by Ark-Mo having a 30% ownership interest in the projects. Later, when Lerner allocated only a 5% interest in BCR to Ark-Mo, Garnett simply could have accepted the 5% proposal, but he refrained from doing so. Instead, Garnett asked Lerner whether Ark-Mo would then be entitled to a 30% interest in future CHEP projects if they are in the Midwest. Lerner

19

answered in the affirmative. Thinking that would be the "best [he] could get at that point," Garnett accepted Lerner's answer and made no further demand regarding BCR. From the parties' exchange and conduct afterwards, it is reasonable to infer that Garnett, on behalf of Ark-Mo, forwent its opportunity to have ownership interest in BCR in lieu of having Lerner agree that Ark-Mo is entitled to a 30% ownership interest in future CHEP projects in the Midwest.

To do so was a detriment to Ark-Mo, as a promisee, because Ark-Mo was not legally bound to forego its opportunity to have a 5% ownership interest in BCR, which is worth approximately $1 million. Garnett, on behalf of Ark-Mo, could have accepted Lerner's 5% proposal and still attempted to have Lerner agree to the terms of the Telephone Deal. However, Garnett chose not to do so and it is reasonable to infer that he made a strategic choice for the "best [he] could get at that point." In other words, Ark-Mo, through Garnett, changed its position in reliance on Lerner's new promise. We find this consideration a valid legal consideration that could sufficiently support a contract. *See Holt v. Jamieson*, 847 S.W.2d 194, 197 (holding that the plaintiff's forbearance from filing a mechanic's lien when he had a right to do so constituted a valid legal consideration for a contract).

Viewing the foregoing evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, we find that Ark-Mo presented substantial evidence from which a reasonable juror could find that valid legal consideration supported the Telephone Deal.

(3) Mutual Obligations

Mutuality of obligation "means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Sumners v. Service Vending Co., Inc.*, 102 S.W.3d 37, 41 (Mo. App. S.D. 2003) (internal citation and quotations omitted). If one party can unilaterally modify

the agreement such that the party could relieve itself of its promises, there is no meaningful mutuality, which renders the agreement illusory and unenforceable. *Seay v. Jones*, 439 S.W.3d 881, 891 (Mo. App. W.D. 2014). However, the tendency of the law is "to uphold the contract by finding the promise was not illusory when it appears that the parties intended a contract." *Magruder Quarry & Co. v. Briscoe*, 83 S.W.3d 647, 650 (Mo. App. E.D. 2002). In Missouri, the covenants of good faith and fair dealing are implied in every contract. *Id.* Consequently, an implied obligation to use good faith and reasonable efforts is enough to avoid finding a contract null and void due to an illusory promise. *Id.*

Here, substantial evidence exists from which a jury could find that mutuality of obligations arose out of the Telephone Deal. Pursuant to the terms of the Telephone Deal, Ark-Mo was obligated not to pursue any ownership interest in BCR in consideration of Lerner's promise to allocate Ark-Mo a 30% ownership interest in future CHEP projects in the Midwest. In return, Lerner was obligated to give Ark-Mo a 30% ownership interest in future CHEP projects the parties would do together in the Midwest. Because both parties were held to an implied requirement to act in good faith and make reasonable efforts, the possibility that there might not be any more opportunities for CHEP projects does not render these mutual obligations illusory. Therefore, we find Ark-Mo presented substantial evidence from which a jury could reasonably find mutuality of obligation existed in the Telephone Deal.

(4) Conclusion

Ark-Mo presented substantial evidence from which a reasonable juror could find that Ark-Mo made a submissible case for breach of contract against Lerner. The testimony of the witnesses on the issues in Ark-Mo's claim was in conflict. Upon hearing the conflicting evidence, reasonable people could differ on the disposition of Ark-Mo's claim for breach of

21

contract. Where reasonable minds can differ on a jury question, the jury decides the issue, *Crank v. Firestone Tire & Rubber Co.*, 692 S.W.2d 397, 400–01 (Mo. App. W.D. 1985). We do not act as a super juror to resolve factual conflicts, *Gurley v. Montgomery First Nat. Bank, N.A.*, 160 S.W.3d 863, 868 (Mo. App. S.D. 2005), and we must defer to the jury's resolution of factual issues when there is any evidence to support their conclusion. *Jones v. Estate of McReynolds*, 762 S.W.2d 854, 856 (Mo. App. E.D. 1989). Accordingly, the trial court was correct in submitting the case to the jury and erred in taking the drastic action of granting Lerner's motion for JNOV as to the verdict awarding Ark-Mo damages for its breach of contract claim against Lerner. Points I and II are granted.

### 3. Lerner's Defenses

In granting Lerner's motion for JNOV, the trial court concluded Ark-Mo did not make a submissible case for its breach of contract claim against Lerner without specifically assigning any of the grounds raised in Lerner's motion for directed verdict. The trial court's grant of JNOV will be affirmed if the trial court's action is supported by at least one of the grounds raised in Lerner's motion for directed verdict. *See Lindquist v. Scott Radiological Group*, 168 S.W.3d 635, 644 (Mo. App. E.D. 2005). Accordingly, we will review the grounds in Lerner's motion for directed verdict that are briefed to us to determine whether the trial court's JNOV can be supported by any.

<u>(1) Statue of Frauds</u>

In Point III, Ark-Mo asserts the trial court erred in granting Lerner's motion for JNOV because Lerner had not preserved the statute of frauds defense. Also, in Point IV, Ark-Mo asserts the trial court abused its discretion in granting Lerner's motion for leave to amend his answer after the close of evidence to add the statute of frauds defense because the record does

22

not reflect any excuse for Lerner's delay in asserting the defense. We agree with Ark-Mo in Point III. Because of our disposition of the claim raised in Point III, we need not address Point IV as it becomes moot.

The statute of frauds is waived by failing to both plead the defense and object to testimony of an oral contract at trial. *Norden v. Friedman*, 756 S.W.2d 158, 162 (Mo. banc 1988). "[E]ven if the statute of frauds is pled, failure to object to offered evidence of the oral agreement constitute[s] a waiver of the protection of the statute." *Crawford v. Detring*, 965 S.W.2d 188, 192 (Mo. App. E.D. 1998) (internal quotations and citation omitted).

Here, the record on appeal clearly shows that Lerner did not make any objection when Garnett testified to the details of the oral agreements between the parties in the Parking Lot Deal and the Telephone Deal. Lerner argues on appeal that Garnett's testimony regarding the Parking Lot Deal and the Telephone Deal was not objectionable during trial because it was "background information" which was "not directly relevant to the specific theories pleaded by [Ark-Mo] in its Petition[.]" We disagree.

It was clear at trial that Garnett's testimony regarding the oral agreements between the parties was not background information. In Ark-Mo's opening statement, Ark-Mo explained in detail the parties' oral agreement in the Parking Lot Deal and the Telephone Deal, along with parties' acts and past dealings that were relevant to the oral agreements. Accordingly, throughout the trial, it was obvious to Lerner that Ark-Mo presented the oral agreements as its theory of recovery. Further, Garnett testified to every detail of the oral agreements in the Parking Lot Deal and the Telephone Deal. Therefore, Lerner was aware of the oral agreements alleged by Garnett and was obligated to raise the statue of frauds at trial. *Norden*, 756 S.W.2d at 162–63. By failing to object to Garnett's testimony at trial, Lerner waived any claimed

23

protection under the statute of frauds. *Crawford*, 965 S.W.2d at 192. Accordingly, Lerner's statute of frauds defense cannot serve as a basis for the JNOV.

(2) BC II Operating Agreement & Lerner's Personal Liability

In Point V, Ark-Mo asserts the trial court erred in granting Lerner's motion for JNOV because the Telephone Deal did not violate the parol evidence rule and was not barred by the BC II Operating Agreement. Ark-Mo argues that the Telephone Deal was not an oral amendment of the BC II Operating Agreement. Ark-Mo further argues that no provision of the BC II Operating Agreement prohibited a separate agreement based on a personal promise by Lerner. In Point VI, Ark-Mo asserts the trial court erred in granting Lerner's JNOV because Lerner was not protected from personal liability under the doctrine of disclosed agency. Ark-Mo argues that Lerner testified he personally controlled who would receive interests in CHEP opportunities and created a direct obligation for himself through his personal promises. We agree with Ark-Mo in both points.

Lerner asserts the BC II Operating Agreement governs the relationship between Ark-Mo and L&M, and any fully disclosed agent of L&M, such as Lerner. Lerner argues that, accordingly, the BC II Operating Agreement would govern any relationship between Ark-Mo and Lerner as the fully disclosed agent of L&M. Because the BC II Operating Agreement contains a merger clause[6] and a clause that prohibits oral modification, Lerner argues that the Parking Lot Deal was superseded by the BC II Operating Agreement and that the Telephone Deal is unenforceable as it is an oral modification of the BC II Operating Agreement. We disagree.

---

[6] Article XVIII, Section 18.1 of the BC II Operating Agreement provides in relevant part, "[t]he [c]ompany [a]greement represents the entire agreement among all the [m]embers and between the [m]embers and the [c]ompany."

24

There was sufficient evidence at trial from which a jury could reasonably decide that the oral agreements in the Parking Lot Deal and the Telephone Deal were not encompassed by the BC II Operating Agreement.

First, there was sufficient evidence at trial from which a jury could reasonably infer that BC II was formed specifically to operate the Southaven facility. Both Lerner and Garnett testified that they went to Harper's office to "set up the company that would [] operate the manufacturing facility in Southaven, [BC II] . . . ." Further, evidence established that Lerner formed a separate entity for every CHEP venture he handled. For instance, BCR was formed to run the Pico Rivera and BC III was formed to run the repair facility in Southaven. BC Midwest was formed to operate a CHEP recycling facility in Jackson, Missouri. Therefore, it is reasonable to conclude that the oral agreements in the Parking Lot Deal and the Telephone Deal were outside the terms of the BC II Operating Agreement. Accordingly, the merger clause and the clause prohibiting oral modification in the BC II Operating Agreement do not bar the oral agreements in the Parking Lot Deal and the Telephone Deal. Also, because the Parking Lot Deal and the Telephone Deal were outside the terms of the BC II Operating Agreement, the parol evidence rule is inapplicable to the oral agreements at issue.

Further, the evidence sufficiently established that the oral agreements in the Parking Lot Deal and the Telephone Deal were made personally by Lerner, not as a disclosed agent of L&M.[7] Lerner specifically testified, "All these opportunities from CHEP were given to Stu Lerner and it was a Stu Lerner opportunity and Stu Lerner decided who was going to be on the team and what percentages they were going to get." Lerner also testified, "[BC II] was never offered any opportunities. All the opportunities were offered to me."

---

[7] Lerner was not a party to the BC II Operating Agreement.

In that sense, we find Lerner's argument that he was not personally liable for the oral agreements lack merit because those agreements were made by Lerner personally, not as a disclosed agent of L&M. "An agent incurs personal liability, regardless of disclosure of the principal, where the agent contracts in his own name, rather than on behalf of his principal." *Moore*, 684 S.W.2d at 494. Based on the evidence, it is reasonable to infer that Lerner contracted in his own name, rather than on behalf of L&M, when he and Garnett orally reached agreements in the Parking Lot Deal and the Telephone Deal. Accordingly, Lerner is not protected from personal liability under the doctrine of disclosed agency.

(3) Conclusion for Lerner's Defenses

For the foregoing reasons, Lerner's defenses on the basis of the statute of fraud, BC II Operating Agreement, and the doctrine of disclosed agency cannot serve as a basis for the JNOV. Points III, V, and VI are granted. Point IV is dismissed as moot.

### 4. Conclusion for Ark-Mo's Claim of Breach of Contract against Lerner

We do not find there is a complete absence of probative facts to support the jury verdict in favor of Ark-Mo. The testimony of the witnesses on the issues in Ark-Mo's claim for breach of contract against Lerner is in conflict. Accordingly, its resolution turns on the credibility of the witnesses, and weighing the credibility of the witnesses is for the jury. *Ross v. Holton*, 640 S.W.2d 166, 171 (Mo. App. E.D. 1982). In resolving the conflicting testimony, we find reasonable people could differ on the disposition of the claim. We do not act as a super juror to resolve factual conflicts, *Gurley*, 160 S.W.3d at 868, and we must defer to the jury's resolution of factual issues when there is any evidence to support their conclusion. *Jones*, 762 S.W.2d at 856. Furthermore, none of the grounds raised in Lerner's motion for directed verdict and briefed to us supports the trial court's JNOV. Therefore, the trial court erred in granting Lerner's motion

26

for JNOV as to the verdict awarding Ark-Mo damages for its claim of breach of contract against Lerner. Points I, II, III, V, and VI are granted. Point IV is dismissed as moot because of our disposition of Point III.

## B. Claim for an Accounting

In Point VII, Ark-Mo asserts the trial court erred in granting defendants' second motion for reconsideration of its interlocutory order for an accounting and entering judgment in favor of defendants on Ark-Mo's claim for an accounting with regard to BC II. Ark-Mo reasons that it established the elements of an accounting claim. Ark-Mo also argues that the record does not support the trial court's conclusion that the damages in the accounting claim were submitted to the jury. We agree.

"[T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). However, questions of law are reviewed *de novo*. *Am. Fam. Mut. Ins. Co. v. Coke*, 358 S.W.3d 576, 579 (Mo. App. E.D. 2012).

The trial court initially entered an interlocutory order for an accounting in favor of Ark-Mo after concluding that Ark-Mo had a right to an accounting.[8] However, the trial court later entered judgment against Ark-Mo on its claim for an accounting, granting defendants' second motion to reconsider interlocutory order for an accounting. The trial court's sole basis for the judgment was that Ark-Mo's "allegations of damages in its supplemental motion for an

---

[8] "An action for an accounting requires the requesting party to show a right to an accounting: the party must show a need for discovery, complicated accounts, a fiduciary or trust relationship between the parties, and lack of an adequate legal remedy." *Gerken v. Sherman*, 351 S.W.3d 1, 6 (Mo. App. W.D. 2011). Accordingly, we presume that Ark-Mo demonstrated its right to an accounting by satisfying the necessary elements because the trial court concluded Ark-Mo had a right to an accounting. Defendants do not dispute whether the trial court erred in concluding that Ark-Mo had a right to an accounting.

27

accounting were presented to the jury" and that the damages Ark-Mo claimed in its motion for an accounting "[were] inextricably entwined in the verdict of $2,169,398.00." The trial court concluded that Ark-Mo could not recover the same damages twice and denied relief requested by Ark-Mo in its claim for an accounting of BC II.

In Missouri, the general premise is that questions a trial court can address without considering the credibility of a witness or other evidence will be considered *de novo* by the appellate court. 24 MO. PRAC., APPELLATE PRACTICE § 3.3 (2d ed.); *see Baker v. Krey Packing Co.*, 398 S.W.2d 185, 187 (Mo. Ct. App. 1965) (holding whether the Industrial Commission should have entered the final award was a question of law because "no question of conflict, credibility or weight [was] present"). Here, the trial court's conclusion that Ark-Mo's allegations of damages in its motion for an accounting were presented to the jury does not involve any question of conflict, credibility or weight of the evidence. Accordingly, we review the trial court's said conclusion *de novo*.

Ark-Mo's action for an accounting stems mainly from four issues based on the undisputed evidence established at trial: (1) approximately $1.2 million in cash remained in BC II's savings account after BC II notified its members that the final distribution of assets had been made; (2) BC II represented that an arbitration with CHEP was concluded when in fact BC II had asserted a claim for monetary damages and the arbitration was still pending at the time of the trial; (3) Lerner caused BC II to pay himself a $260,000 consulting fee after the underlying litigation was commenced; and (4) Lerner caused BC II to pay all of the attorneys' fees for the underlying litigation while no other defendant paid attorneys' fees. Ark-Mo argues the record does not support the trial court's conclusion that these issues were submitted to the jury. We agree with Ark-Mo on the first three issues and partially on the fourth issue.

At trial, two claims were submitted by Ark-Mo to the jury - a claim of breach of fiduciary duty against L&M and a claim of breach of contract against Lerner. The jury instruction for the breach of fiduciary claim was as follows in its entirety:

> Your verdict must be for [Ark-Mo] and against [L&M], if you believe:
> First, [L&M] either:
> [L&M] failed to provide [Ark-Mo] a 30% interest in all future business with CHEP, or
> [L&M] failed to provide [Ark-Mo] a 30% interest in the CHEP opportunities in the Midwest, and
> Second, [L&M], in any one or more of the respects submitted in paragraph First, breached its fiduciary duty to [Ark-Mo].
> Third, as a direct result of such breach, [Ark-Mo] sustained damage.
> For purposes of this instruction, "fiduciary duty" means that a managing member of a Limited Liability Company occupies a position of trust and is bound to act with fidelity and utmost good faith.

The jury instruction for the breach of contract claim against Lerner was as follows in its entirety:

> Your verdict must be for [Ark-Mo] if you believe:
> First, [Ark-Mo] and [Lerner] entered into an agreement whereby [Ark-Mo] agreed to forego an ownership interest in [BCR] and [Lerner] agreed that [Ark-Mo] would have a 30% ownership interest in future [Lerner] and [L&M] opportunities with CHEP in the Midwest, and
> Second, [Ark-Mo] performed its agreement, and
> Third, [Lerner] failed to perform his agreement, and
> Fourth, Ark-Mo was thereby damaged.

Neither of the jury instructions concerns the issues that $1.2 million in cash were left in BC II's bank account even after the final distribution was made, that the arbitration with CHEP regarding BC II's claim for monetary damages had not concluded, and that Lerner caused BC II to pay himself a $260,000 consulting fee. Furthermore, the only evidence of Ark-Mo's damages was Hoffman's testimony regarding his analysis of BC entities' tax returns from 2005 to 2013 and Summary of Damage Analysis (the "Summary") which was prepared by Hoffman and provided to the jury during deliberations. Neither the Hoffman's testimony nor the Summary

29

contains information as to the 1.2 million dollars in BC II's bank account, monetary value of BC II's arbitration claim against CHEP, and Lerner's consulting fee of $260,000. In addition, Ark-Mo did not request the jury to consider these issues in determining Ark-Mo's damages in its two claims against defendants.[9] Therefore, the trial court erred in concluding that the first three issues in Ark-Mo's accounting claim were submitted to the jury.

On the other hand, the last issue of Lerner causing BC II to pay all the attorneys' fees for defendants in the underlying litigation was partially presented and submitted to the jury. As Ark-Mo concedes in its brief, the Summary and Hoffman's testimony contain information regarding past attorneys' fees which were a part of the damage claim submitted to the jury. Ark-Mo, however, argues that the accounting was needed for attorneys' fees for 2014 and future excess legal fees because those were not part of the damage claim submitted to the jury. We agree. The evidence at trial concerned legal fees paid by BC II only through 2013. Accordingly, the issue of excess legal fees after 2013 was not presented and submitted to the jury. Therefore, the trial court erred in concluding that all of the four issues in Ark-Mo's accounting claim were submitted to the jury. Point VII is granted.

## IV. Conclusion

The trial court's JNOV regarding Ark-Mo's claim for breach of contract against Lerner is reversed and the cause is remanded with instructions to enter judgment in accordance with the jury's verdict awarding Ark-Mo $2,169,398 in damages. Also, the trial court's judgment in favor of defendants and against Ark-Mo on Ark-Mo's claim for an accounting is reversed and

---

[9] We find the defendants' argument that counsel for Ark-Mo admitted and argued that all four issues were a part of the breach of fiduciary claim submitted to the jury by Ark-Mo meritless. Ark-Mo specifically removed the issues of Lerner's consulting fee and BC II's failure to distribute all assets of BC II from the jury instruction for the breach of fiduciary duty claim. Also, Ark-Mo's counsel described the issues related to the accounting claim in urging the jury to find in favor of Ark-Mo for the issue of credibility of witnesses, rather than for the actual merit of the accounting claim.

remanded with instructions to reinstate the trial court's interlocutory order for an accounting, dated September 29, 2014, and to proceed in accordance with the order. In proceeding with an accounting, the trial court shall exclude from the accounting the issue of attorneys' fees expended by BC II from 2009 to 2013.

_____
Angela T. Quigless, Judge

Philip M. Hess, P.J., and
Gary M. Gaertner, Jr., J., Concurs.